UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

UPSTATE JOBS PARTY; MARTIN BABINEC; and
JOHN BULLIS,

                            Plaintiffs,

v.                                                              18-CV-0459
                                                                (GTS/ATB)

PETER S. KOSINSKI, New York State Bd. of
Elections Co-Chair Comm'r, in his official capacity;
DOUGLAS A. KELLNER, New York State Bd.
of Elections Co-Chair Comm'r, in his official capacity;
ANDREW J. SPANO, New York State Bd. of
Elections Comm'r, in his official capacity; and
GREGORY P. PETERSON, New York State Board of
Elections Comm'r, in his official capacity,

                            Defendants.
_____

APPEARANCES:                                      OF COUNSEL:

SANTIAGO BURGER, LLP                              FERNANDO SANTIAGO, ESQ.
   Counsel for Plaintiffs                         MICHAEL A. BURGER, ESQ.
2280 East Avenue
Rochester, NY 14610

HOLTZMAN VOGEL JOSEFIAK                           JASON B. TORCHINSKY, ESQ.
TORCHINSKY, PLLC                                  SHAWN T. SHEEHY, ESQ.
   Co-Counsel for Plaintiffs                      PHILLIP M. GORDON, ESQ.
15405 John Marshall Highway
Haymarket, VA 20169

HON. LETITIA A. JAMES                             WILLIAM A. SCOTT, ESQ.
Attorney General for the State of New York        Assistant Attorney General
   Counsel for Defendants
The Capitol
Albany, NY 14202

GLENN T. SUDDABY, Chief United States District Judge

# Table of Contents

I.   RELEVANT BACKGROUND...............................................................................1

   A.  Plaintiffs' Claims....................................................................................1

   B.  Undisputed Material Facts......................................................................2

   C.  Parties' Briefing on Their Cross-Motions for Summary Judgment.....................16

   D.  Parties' Briefing on Plaintiffs' Motions to Exclude...............................27

      1.  Plaintiffs' Motion to Exclude the Declaration and Testimony of Brian Quail.....27

      2.  Plaintiffs' Motion to Exclude the Expert Report of Dr. Clyde Wilcox.............. 28

II.  RELEVANT LEGAL STANDARDS.................................................................30

   A.  Legal Standard Governing Motions for Summary Judgment............................30

   B.  Legal Standard Governing Motions to Preclude Expert Evidence........................33

III. ANALYSIS....................................................................................................37

   A.  Whether Brian Quail's Declaration and Testimony and Dr. Clyde Wilcox's Expert
       Report and Testimony Should Be Stricken............................................... 37

      1.  Qualifications.................................................................................... 38

      2.  Reliability of Expert Opinions.............................................................39

      3.  Whether Expert Opinions Assist the Trier of Fact................................41

   B.  Whether Plaintiffs or Defendants Are Entitled to Summary Judgment on Plaintiffs'
       Claims ....................................................................................................... 43

      1.  Substantive Legal Standard...............................................................43

         a.  Plaintiffs' Claims Under the First Amendment.............................. 43

         b.  Plaintiff's Claims Under the Fourteenth Amendment............................. 45

      2.  Whether Plaintiffs or Defendants Are Entitled to Summary Judgment on
         Plaintiffs' Contribution-Limit Claims.................................................... 48

         a.  Whether Defendants Have Established a Sufficiently Important Interest for
             Purposes of Plaintiffs' Contribution-Limit Claims..........................................48

         b.  Whether Defendants Have Established a Compelling State Interest for
             Purposes of Plaintiffs' Contribution-Limit Claims...................................51

         c.  Whether the Laws Regarding Contribution-Limits Are Closely Drawn
             for Purposes of Plaintiffs' Claims Under the First Amendment.................52

             i.   Laws Regarding Contribution Limits in General Elections.................54

             ii.  Laws Regarding Contribution Limits in Primary Elections..............58

         d.  Whether the Laws Regarding Contribution-Limits Are the Least-Restrictive
             Means for Purposes of Plaintiffs' Claims Under the Fourteenth
             Amendment........................................................................................59

**3.  Whether Plaintiffs or Defendants Are Entitled to Summary Judgment on Plaintiffs' Housekeeping-Account Claims………………………………………..62**

**a.  Whether the Laws Regarding Housekeeping Accounts Are Closely Drawn for Purposes of Plaintiffs' Claims Under the First Amendment…………………..63**

**b.  Whether the Laws Regarding Housekeeping Accounts Are the Least-Restrictive Means for Purposes of Plaintiffs' Claims Under the Fourteenth Amendment…………………………………………………………………….65**

**DECISION and ORDER**

Currently before the Court, in this civil rights action filed by the Upstate Jobs Party, Martin Babinec, and John Bullis ("Plaintiffs") against the four commissioners of the New York State Board of Elections ("Defendants"), is Plaintiffs' motion for summary judgment, Defendants' cross-motion for summary judgment, and Plaintiffs' two motions to strike the declaration, report and testimony of two of Defendants' experts.  (Dkt. No. 56, 57, 60, 61.)  For the reasons set forth below, Plaintiffs' motion to strike Brian Quail's declaration and testimony is denied in part and granted in part, Plaintiffs' motion to strike Clyde Wilcox's expert report and testimony is denied, Plaintiffs' motion for summary judgment granted in part and denied in part, and Defendants' cross-motion for summary judgment is granted in part and denied in part.

I.      **RELEVANT BACKGROUND**

A.      **Plaintiffs' Claims**

Generally, liberally construed, Plaintiffs' Complaint alleges that New York State's Election Law improperly distinguishes between statutorily recognized political "parties" (hereafter "Parties") and "constituted committees" (hereafter "Constituted Committees") on the one hand and statutorily recognized "independent bodies" (hereafter "Independent Bodies") such as the United Jobs Party ("UJP") on the other hand with regard to contribution limits and segregated accounts, thereby creating a "tilted playing field" against Independent Bodies.  (Dkt. No. 1.)

Generally, based on these allegations, the Complaint asserts six causes of action: (1) a request for a judgment declaring that New York State's so-called "housekeeping account exemption," codified in N.Y. Elec. Law § 14-124(3), violates both the Free Speech and Association Clauses of the First Amendment; (2) a request for a judgment declaring that the same

"housekeeping account exemption" violates the Equal Protection Clause of the Fourteenth

Amendment; (3) a request for a judgment declaring that New York State's differing limits for

contributions by political organizations to candidates, codified in N.Y. Elec. Law § 14-114(1),(3)

violates both the Free Speech and Association Clauses of the First Amendment and the Equal

Protection Clause of the Fourteenth Amendment, by prohibiting Plaintiff UJP from contributing

more than $44,000[1] to its gubernatorial candidate, in contrast to the Parties and Constituted

Committees which can make unlimited contributions to their candidates, without having a

compelling interest for doing so or using a narrowly tailored means to accomplish such an interest;

(4) a request for a judgment declaring that the same statute violates Plaintiff Babinec's right to

make political contributions to Plaintiff UJP under the First Amendment, by limiting his

contribution to $44,000, which is substantially less than he could contribute to any of the Parties or

Constituted Committees; (5) a request for a judgment declaring that New York State's differing

limits for contributions by individual contributors to political organizations, codified in N.Y. Elec.

Law § 14-114(1),(10), violates both the Free Speech and Association Clauses of the First

Amendment and the Equal Protection Clause of the Fourteenth Amendment, by prohibiting

Plaintiff UJP from raising more than $44,000 per contributor for its gubernatorial candidate while

permitting Parties and Constituted Committees to raise up to $109,600 per contributor for their

gubernatorial candidates, without having an anti-corruption interest to justify the disparity; and (6)

a request for a judgment declaring that New York State's statute limiting contributions to

---

[1]     The figures that were at issue when Plaintiffs originally filed their Complaint and motion for preliminary injunction were $44,000.00 and $109,6000.  9 N.Y. Comp. Codes R. & Regs tit. 9 § 6214.0 (2019).  However, those figures have since changed to $47,100.00 and $117,600.00]. The Court will use the updated figures in the remaining sections of this Decision and Order.

candidates, codified in N.Y. Elec. Law § 14-114 and 9 N.Y.C.R.R. § 6214.0, violates both the Free

Speech and Association Clauses of the First Amendment and the Equal Protection Clause of the

Fourteenth Amendment, by permitting Party and Constituted Committee candidates for governor

to raise money in a primary election while prohibiting Plaintiff UJP's candidate for governor from

doing so.  (*See generally* Dkt. No. 1 [Plfs.' Compl.].)  Familiarity with the factual allegations

supporting these claims in Plaintiffs' Complaint is assumed in this Decision and Order, which is

intended primarily for review by the parties.  (*Id*.)

### B.   Undisputed Material Facts

Unless otherwise noted, the following facts were asserted and supported with accurate

citations by the parties in their Statements of Material Facts and expressly admitted, or denied

without appropriate record citations, in their responses thereto.  (*Compare* Dkt. No.56, Attach. 2

[Plfs.' Rule 7.1 Statement] *with* Dkt. No. 57, Attach 7, at 1-28 [Defs.' Rule 7.1 Resp.]; *compare*

Dkt. No. 57, Attach. 7, at 28-32 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 58, at 58-88 [Plfs.' Rule

7.1 Resp.)[2]

### 1.   Plaintiffs' Statement of Material Facts

1.     In early 2016, Mr. Martin Babinec decided he wanted to run for the U.S. House of

Representatives to replace Republican Congressman Richard Hanna.  (Dkt. No. 56,

Attach. 2 at ¶ 1.)  Mr. Babinec decided to campaign for Congress under the banner

---

[2]     The Court begins by noting that, although Plaintiffs have attempted to file a "reply" to each of Defendants' denials of various of Plaintiffs' factual assertions, the Court rejects, and will not consider, those replies, because they are not permitted under either Fed. R. Civ. P. 56 or Local Rule 56 of the Local Rules of Practice for this Court (formerly Local Rule "7.1").  Indeed, Plaintiffs' purported "replies," by containing legal argument, are an attempt to improperly circumvent the Court's page limitation on its reply/opposition memorandum of law.  (*Compare* Dkt. No. 58, at 14-57 *with* Dkt. No. 59.)

of a new Independent Body, the UJP.  (*Id.* at ¶ 2.)  The UJP is considered an Independent Body under New York State law.  (*Id.* at ¶ 3.)

2.    With the help of approximately 60 volunteers, Mr. Babinec obtained the 3,500 signatures on independent nominating petitions that were required under New York law.  (*Id.* at ¶ 4.)  To assist his campaign efforts, Mr. Babinec used his personal money to loan his campaign $2,990,000.  (*Id.* at ¶ 5.)

3.    Eventually, Mr. Babinec's UJP line was consolidated with the Libertarian line; instead of appearing on his own line, he appeared on the Libertarian line with a small notation in 3.5-point font stating that he was the UJP nominee.  (*Id.* at ¶ 6.)  Mr. Babinec lost the election, receiving 34,638 votes, or 12.4% of the total votes cast.  (*Id.*)

4.    Desiring to seize on the momentum gained from the 2016 election, the UJP sought to build its visibility in 2017.  (*Id.* at ¶ 7.)  In incurring expenses to increase its visibility, the UJP spent between approximately $50,000 and $100,000.  (*Id.* at ¶ 8.)  These expenses including the cost of building and maintaining a digital messaging presence, boosting social media, and hosting a few public meetings where speakers from the UJP spread its message.  (*Id.* at ¶ 9.)

5.    On or about October 26, 2017, the UJP formed the Upstate Jobs Committee, an independent expenditure-only committee.  (*Id.* at ¶¶ 12, 21.)  The Upstate Jobs Committee is distinct from the UJP, a Section 501(c)(4) organization under the Internal Revenue Code.  (*Id.* at ¶ 22.)[3]  The Upstate Jobs Committee obtained a

---

[3]    Although Defendants deny an implication of the facts asserted by Plaintiff (specifically,

separate EIN and opened a bank account separate from the account with the UJP. (*Id*.)

6.     The UJP identified one candidate to support in 2017, Ben Walsh, an independent candidate for Mayor of Syracuse.  (*Id*. at ¶ 10.)  The UJP did not make any contributions to Mr. Walsh's campaign.

7.     The UJP volunteers circulated independent nominating petitions seeking to include Mr. Walsh's name on the UJP line on the ballot.  (*Id*. at ¶ 11.)  Mr. Walsh obtained a sufficient number of signatures to appear on the UJP line.  (*Id*.)

8.     The Upstate Jobs Committee made $22,074 in independent expenditures in support of Mr. Walsh; specifically, this money was spent on digital media advertisements and mailers to support Mr. Walsh's campaign.  (*Id*. at ¶¶ 12, 26, 27.)  Mr. Walsh won his election for Mayor of Syracuse in 2017.  (*Id.* at ¶ 28.)

9.     On December 27, 2017, the UJP was formally incorporated as Vote Upstate Jobs, Inc.  (*Id*. at ¶ 13.)  Vote Upstate Jobs, Inc., is a non-profit corporation organized under Section 501(c)(4) of the Internal Revenue Code.  (*Id*. at ¶ 14.)

10.    The initial board of directors of the UJP ("the UJP Board") consisted of John Bullis

---

that the entries are anything more than "legally" distinct, and that the admitted legal distinction is anything more than an "academic question"), such a denial of an implication is inappropriate under Fed. R. Civ. P. 56 and the District's Local Rules of Practice.  *See* N.D.N.Y. L.R. 7.1(a)(3) ("The non-movant's responses shall . . . admit[] and/or deny[] each of the movant's *assertions* in matching numbered paragraphs.") (emphasis added); *Yetman v. Capital Dis. Trans. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (citing authority for the point of law that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts); *cf. Goldstick v. The Hartford, Inc.*, 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (striking plaintiff's Rule 56.1 Statement, in part, because plaintiff added "argumentative and often lengthy narrative in almost every case the object of which is to 'spin' the impact of the admissions plaintiff has been compelled to make").

(Chairman and Executive Director), Martin Babinec (Secretary and Director), and Paul Allen (Director). (*Id.* at ¶¶ 15, 52.) These three individuals have served as directors of the UJP since 2016. (*Id.* at ¶ 52.)

11.    The duties of the UJP Board include developing strategy and collectively deciding the future direction of UJP. (*Id.* at ¶ 53.) The UJP Board also decides which candidates the UJP should support, and the Board has the final say in decisions for the UJP. (*Id.*)

12.    The UJP is managed and run by its Board. (*Id.* at ¶ 63.)

13.    The UJP received donations to cover its expenses in 2017.[4] (*Id.* at ¶ 18.)

14.    In 2017, the UJP did not have an office; however, the UJP had approximately ten volunteers. (*Id.* at ¶ 19-20.)

15.    In 2017, the Upstate Jobs Committee received approximately $25,000 in contributions; all of this money was donated by Mr. Babinec. (*Id.* at ¶ 25.)

16.    In 2018, the UJP had more public meetings and endorsed more candidates. (*Id.* at ¶ 30.) Specifically, the UJP had more than six public meetings during which speakers

---

[4]    Despite the fact that Plaintiffs contend it is not speculation that Plaintiff UJP would have spent more money to increase its visibility with a higher contribution limit, the statement itself, as well as the testimony cited in support of the statement, are indeed speculation, unsupported by any admissible evidence. (Dkt. No. 8, at ¶ 18.) Furthermore, contrary to Plaintiffs' argument, the remaining assertions in this paragraph of Plaintiffs' Statement of Material Facts are founded upon a condition precedent that never happened. Finally, the testimony cited by Plaintiffs in their "reply" to Defendants' response to Plaintiffs' Statement of Material Facts was not originally cited by Plaintiffs in their original Statement. (Dkt. No. 56, Attach. 2, at ¶ 18; Dkt. No. 57, Attach. 7, at ¶ 18; Dkt. No. 58, at ¶ 18.) In this District, a "reply" to a response to a statement of material facts is not permitted because, among other reasons, the party responding to the statement of material facts has had no opportunity to file a sur-reply to the reply; thus Plaintiffs' "reply" will be disregarded. N.D.N.Y. L.R. 56.1(b). Accordingly, Defendants have successfully controverted the remaining assertions in this paragraph of Plaintiffs' Statement of Material Facts.

from it spoke about its message.  (*Id.* at ¶ 31.)  The UJP endorsed Carrie Woerner, Daphne Jordan, Bob Antonacci, and Keith Wofford.  (*Id.* at ¶ 34.)

17.    In addition to endorsing Mr. Antonacci, the UJP assisted in circulating petitions on behalf of the Antonacci campaign so that Mr. Antonacci could obtain sufficient independent nominating petition signatures to run on the UJP ballot line.  (*Id.* at ¶ 35.)  Unlike Mr. Babinec in 2016 and Mr. Walsh in 2017, Mr. Antonacci appeared on the UJP line.  (*Id.* at ¶ 36.)  Mr. Antonacci received 347 votes on the UJP line.  (*Id.*)

18.    In 2018, the UJP received $88,000 in contributions, had $48,891 in program expenses, and paid $42,204 to consultants.[5]  (*Id.* at ¶ 32.)  The UJP spent $6,577 in media fees; in particular, these payments were for social media fees across all platforms and for digital advertising promoting the UJP.[6]  (*Id.* at ¶ 33.)

19.    In 2018, the Upstate Jobs Committee received $110,135 in contributions; $110,000 of these contributions came from Mr. Babinec.  (*Id.* at ¶ 37.)  The Upstate Jobs Committee spent $74,060.85 on digital media and mailers to promote the UJP message and promote the candidacies of Carrie Woerner, Democrat for State Assembly, Bob Antonacci, Republican for State Senate, and Daphne Jordan, Republican for State Senate.  (*Id.* at ¶ 38.)  Each candidate won his or her respective election.  (*Id.* at ¶ 40.)

---

[5]    Defendants' denial of Plaintiffs' asserted statement of material fact fails to specifically controvert the fact that Plaintiff UJP had $48,891 in program expenses and within the program expenses, $42,204 was paid to consultants.  (Dkt. No. 57, Attach. 7, at ¶ 32.)

[6]    Defendants' denial of Plaintiffs' asserted statement of material fact fails to specifically controvert the fact that Plaintiff UJP had $6,577 in media fees.  (Dkt. No. 57, Attach. 7, at ¶ 33.)

20.    These digital and mail ads promoted not only the candidates that the UJP endorsed but also the UJP's platform of bringing "innovation economy jobs" to Upstate New York.  (*Id.* at ¶ 39.)

21.    In 2018, the UJP did not have an office space or employees.  (*Id.* at ¶ 41.)  During the first half of 2019, the UJP held two events.  (*Id.* at ¶ 42.)  These events were public forums for the purpose of promoting the UJP platform and to engage local officials to discuss with the public the approach to creating jobs and retaining talent.  (*Id.*)  The UJP also continued with its expenses of promoting its message and platform to the public.  (*Id.* at ¶ 43.)  Some of the events included focus group meetings, which were held in Utica, Albany, and Syracuse and had approximately twelve to twenty millennial voters per meeting.  (*Id.* at ¶ 44.)  The purpose of these meetings was to both promote the UJP's message and tailor its message by gauging the attendee's responses.  (*Id.*)

22.    In 2019, the UJP endorsed six candidates: Lynne Dixon, Republican candidate for Erie County Executive; Ryan McMahon, Republican candidate for Onondaga County Executive; Kevin Tollisen, Republic candidate for Saratoga Board of Supervisors / Halfmoon Supervisor; Michele Madigan, Working Families, Independence Party, and Serve America Movement party candidate for Saratoga Springs Commissioner of Finance; Mark Blask, Democratic party candidate for Mayor of Little Falls; Robert Palmeri, Democratic party candidate for Mayor of Utica; and Tony Picente, Republican party candidate for Oneida County Executive.  (*Id.* at ¶ 45.)

23.   In 2019, the Upstate Jobs Committee received $130,898 in contributions from Mr. Babinec.  (*Id*. at ¶ 46.)  The Upstate Jobs Committee spent $60,398.23 in digital advertising and independent expenditure mail-pieces.  (*Id*. at ¶ 47.)  Of this sum, $38,964.48 was spent on independent expenditures supporting the candidacies of Lynne Dixon for Erie County Executive and Ryan McMahon for Onondaga County Executive.  (*Id*.)

24.   The UJP does not currently have an office or employees.  (*Id*. at ¶ 48.)

25.   The Upstate Jobs Committee is also run by a board of directors ("the Upstate Jobs Committee Board").  (*Id*. at ¶ 64.)  The Upstate Jobs Committee Board makes final decisions on what expenditures to make in support of candidates.  (*Id*.)  From 2017 through August 2019, the Upstate Jobs Committee Board of Directors was the same as the UJP Board of Directors: John Bullis, Martin Babinec, and Paul Allen.  (*Id*.)

26.   On August 30, 2019, the Upstate Jobs Committee voted Daniel Reardon and Anthony DeLuca as the new members of the Board of Directors.  (*Id*. at ¶ 65.)  The current composition of the Upstate Jobs Committee Board is Daniel Reardon, Anthony DeLuca, and Martin Babinec.  (*Id*.)

27.   Tim Dunn and Dan O'Sullivan also serve on the leadership team of the UJP; Mr. Dunn is the UJP's communications director and Mr. O'Sullivan is a volunteer.  (*Id*. at 54-55.)

28.   Since 2016, Mary Lou Herringshaw has served the UJP as a volunteer treasurer, and currently serves the UJP as a bookkeeper.  (*Id*. at ¶ 60-61.)

29.   Decisions made by the UJP and the Upstate Jobs Committee, including budget

decisions, are separate and distinct from one another (although any knowledge of

where the UJP has decided to put its resources would be considered by the Upstate

Jobs Committee when deciding where to put its resources).[7]  (*Id*. at ⁋ 69.)

30.     The Upstate Jobs Committee's decisions concerning independent expenditures are

made consistent through use of a firewall policy.[8]  (*Id*. at ⁋ 70.)

31.     The Upstate Jobs Committee, its board members, agents, and volunteers have never

crafted or disseminated an independent expenditure at the suggestion,

encouragement, or assistance of any candidate, candidate's committee, or any

officer, staff, or agent of a candidate or candidate's committee.  (*Id*. at ⁋ 71.)

---

[7]      Although Defendants deny this fact, they fail to support their denial with a citation to admissible record evidence that actually creates a genuine dispute of material fact.  (Dkt. No. 57, Attach. 7, at ⁋ 69.)  Rather, Defendants appear to (conclusorily) argue that a member of a board of directors cannot possibly serve on two boards and fulfill his or her fiduciary duty to each.  They offer no authority for that argument.  In any event, the only record citation offered by Defendants in support of their denial is to pages 36 and 37 of the deposition testimony of Mr. Babinec.  However, the mere fact that certain information received by the directors of the UJP may also be used by those individuals as directors of the Upstate Jobs Committee (i.e., what candidates the UJP will be backing, which incidentally appears to be public information) does not controvert the assertion that the *decisions* made both those entities (by their boards of directors acting in their capacities as fiduciaries) are separate and distinct from one another.  (Dkt. No. 56, Attach. 3, at 37-38 [attaching pages "36" and "37" of the deposition testimony of Mr. Babinec].)  The Court notes that Defendants' challenge to Plaintiffs' ability to comply with their firewall policy (which is implicit it their response to the above-asserted fact and explicit in their response to the next asserted fact) is more appropriate for trial, because it goes to the weight, not admissibility, of evidence of Plaintiffs' ability to make separate and distinct decisions in their capacities at the Upstate Jobs Committee and UJP.  (Dkt. No. 57, Attach. 7, at ⁋ 69.)

[8]      Although Defendants partially deny this fact, their denial is ineffective.  More specifically, Defendants deny that "that there is any practical method of complying with that policy."  (Dkt. No. 57, Attach. 7, at 70.)  However, Plaintiffs never assert that "there is a practical method of complying with the policy."  In this sense, Defendants are denying an implication of Plaintiffs' asserted fact, which is not permissible under Local Rule 56.1(b).  *See, supra,* note 3 of this Decision and Order.  In any event, Defendants fail to cite to any evidence in the record in support of their partial denial.

32.     None of the content appearing in any Upstate Jobs Committee independent expenditure has contained information obtained from the candidate, or candidate's officer, employee, or agent, concerning that candidate's electoral campaign plans, projects, or activities that were not otherwise publicly available.  (*Id*. at ⁋ 72.)

33.     Every principal, employee, vendor, and independent contractor from both the UJP and the Upstate Jobs Committee has reviewed, approved, and executed a Firewall Compliance Policy to further prevent the use of private information obtained from meetings between Upstate Jobs Party officials and candidates in the crafting and disseminating of independent expenditures by the Upstate Jobs Committee.  (*Id*. at ⁋ 73.)

34.     The firewall policy establishes a two-part structure to prevent "coordination" under either the federal or the New York State definition of that term.  (*Id*. at ⁋ 74.)  The first part of the firewall policy requires the Upstate Jobs Committee to take steps to prevent itself from obtaining strategy information, i.e., information obtained within two years of an election about the candidate's electoral campaign plans, projects, or activities, that is not obtained from a publicly available source.  (*Id*.)  Any Upstate Jobs Committee principal, employee, vendor, or independent contractor who obtains any private information about a particular candidate's campaign plans, projects or activities must not share or discuss, in any way, that information with any other Upstate Jobs Committee principal, employee, or independent contractor. (*Id*.)  Furthermore, any principal, employee, vendor, or independent contractor who does obtain this information will play no role in connection with any specific

11

independent expenditure in support of that candidate.  (*Id*.)

35.   The second part of the firewall policy requires that the Upstate Jobs Committee's
decisions about whether to make an independent expenditure in support of a
candidate be based solely on publicly available information.  (*Id*. at ¶ 75.)   This
policy is enforced.  (*Id*. at ¶ 76.)  For example, during a fall 2019 board meeting
during which the Upstate Jobs Committee made decisions to endorse candidates,
the Upstate Jobs Committee made those decisions based solely on publicly
available information.  (*Id*.)  In an abundance of caution, when the Board discussed
Mark Blask's endorsement and budget for independent expenditures, the Board
asked that fellow board member Tony DeLuca leave the room because he may have
had strategic information.  (*Id*.)

36.   The UJP has enacted a similar firewall policy.  (*Id*. at ¶ 77.)  UJP recognizes that, in
the course of carrying out their duties, UJP principals, employees, vendors, and
independent contractors may engage in discussions with candidates, and that these
discussions may include strategic information about the candidate's campaign
plans, projects, or activities and is not information that is publicly available.  (*Id*.)
To prevent coordination, the UJP prohibits its principals, employees, vendors, and
independent contractors who have engaged in discussions with candidates from
having any involvement with independent expenditures made in support of that
candidate through the Upstate Jobs Committee.  (*Id*.)  UJP principals, employees,
vendors, and independent contractors who have obtained strategic information
through discussions with candidates are also prohibited from sharing this

12

information with Upstate Jobs Committee principals, employees, vendors, and independent contractors in connection with an independent expenditure in support of that particular candidate.  (*Id*.)  Maintaining this prohibition also prevents impermissible corporate contributions that may jeopardize the UJP's tax-exempt status.  (*Id*.)

37. The UJP Board has unanimously approved and adopted the UJP's firewall policy. (*Id*. at ¶ 78.) John Bullis, Martin Babinec, and Timothy Dunn have also executed the UJP firewall policy.  (*Id*.)  Similarly, the Upstate Jobs Committee Board of Directors has adopted the Upstate Jobs Committee's firewall policy.  (*Id*. at ¶ 79.) Martin Babinec, Timothy Dunn, Daniel Reardon, and Anthony DeLuca have also executed the Upstate Jobs Committee firewall policy. (*Id*.)

38. The UJP (which again is a Section 501[c][4] organization under the Internal Revenue Code) has never received funds from the Upstate Jobs Committee (an independent expenditure-only committee); similarly, the Upstate Jobs Committee has never received funds from the UJP.  (*Id*. at ¶ 80.)

39. The State Board of Elections has no record of any enforcement action brought against Independent Bodies for violations of (a) the limit on contributions from individuals to Independent Bodies, (b) the limit on contributions from Independent Bodies to candidates, or (c) the limits on Independent Bodies establishing a housekeeping account.  (*Id*. at ¶ 90.)

   **2.    Defendants' Statement of Material Facts**

1. New York Election Law creates classifications of political entities.  (Dkt. No. 57,

Attach. 7, at 28, ¶ 1.)

2.      A "Party" is formed under New York's Election Law if a candidate for any political
organization receives two percent of the total votes cast for its candidate for
governor, or one hundred thirty thousand votes, whichever is greater, in the year in
which a governor is elected and at least two percent of the total votes cast for its
candidate for president, or one hundred thirty thousand votes, whichever is greater,
in a year when a president is elected.  (*Id.* at ¶ 2.)

3.      Parties must comply with organizational requirements of the Election Law.  (*Id.* at ¶
3.)

4.      New York Election Law does not distinguish between Parties based on their size.
(*Id*. at ¶ 4.)

5.      New York Election Law does not recognize "start-up political parties."  (*Id*. at ¶ 5.)

6.      As of February 21, 2020, New York State recognized eight separate Parties (i.e.,
Democrat, Republican, Conservative, Working Families, Green, Libertarian,
Independence and SAM).  (*Id*. at ¶ 6.)  The eight Parties recognized by New York
State at that time had a total of 8,909,542 enrollees, which represented
approximately 76% of the enrolled voters in the State.  (*Id*. at ¶ 6.)

7.      Plaintiffs do not challenge New York State's mechanism for creating Parties, nor do
they seek to change New York Election Law to create any new political entity.
(Dkt. No. 57, Attach. 7, at ¶ 8-9.)  Instead, Plaintiffs challenge the two-tiered
contribution limit that places Independent Bodies like Plaintiff UJP at a
disadvantage.  (Dkt. No. 58, at 79.)

8.      Plaintiff UJP is an Independent Body and is not one of the eight Parties recognized by New York State.  (*Id.* at ¶¶ 10-11.)

9.      The New York State Legislature has not established organization requirements for "Independent Bodies," which do not have the same reporting requirements as Parties.  (*Id.* at ¶¶ 12-13.)

10.     Independent Bodies normally serve as an alter ego of a particular candidate to get a ballot label.[9]  (*Id.* at ¶ 14.)

11.     New York Law sets no maximum number of members for an entity to be considered an Independent Body.  (*Id.* at ¶ 16.)

12.     Parties occupy a unique position in our democracy.  (*Id.* at ¶ 17.)

13.     Large, direct contributions to political candidates presents a risk of quid pro quo corruption and/or the appearance thereof.  (*Id.* at ¶ 20.)

14.     Generally, people try to hide quid pro quo corruption.  (*Id.* at ¶ 21.)

15.     New York State allows some of the highest individual contributions in the country.  (*Id.* at ¶ 24.)

16.     Plaintiff Babinec has never donated the maximum allowable amount to Plaintiff

---

[9]      Although Plaintiffs deny this fact, their denial is ineffective.  In this case, Mr. Quail is referring to the general nature of Independent Bodies, not the nature of the UJP.  (Dkt. No. 56, Attach. 3, at 377.)  Despite Plaintiffs' citation to record evidence disputing that the UJP is serving as an alter ego of a candidate, this evidence does not contradict Mr. Quail's statement regarding the general nature of Independent Bodies.  Moreover, Plaintiffs argue that, generally, Independent Bodies are not "overwhelmingly" the alter ego of a candidate.  However, Plaintiffs fail to cite to any record evidence establishing the general or "overwhelming" nature of Independent Bodies.  (Dkt. No. 58, at 65-66.)  Finally, Plaintiffs argue the Court should not consider Mr. Quail's testimony because Defendants proffer him as an expert in New York election law.  (*Id.* at 66.)  For the reasons more fully explained in Part III.A of this Decision and Order, the Court considers Mr. Quail's testimony concerning the general nature of Independent Bodies.

UJP.  (*Id.* at ⁋ 30.)

17.    Plaintiff Bullis has never donated the maximum allowable amount to Plaintiff UJP.
       (*Id.* at ⁋ 31.)

18.    Plaintiff UJP has never donated the maximum allowable amount to any candidate
       for political office.  (*Id.* at ⁋ 32.)

Finally, the Court notes that, in determining the above-listed undisputed material facts, the
Court has relied on the point of law that, when deciding motions for summary judgment, district
courts can consider supporting and opposing declarations or affidavits that set forth evidence that
would be admissible at trial.  Fed. R. Civ. P. 56(e).  However, "[w]here a declaration is used to
support or oppose the motion, it 'must be made on personal knowledge, set out facts that would be
admissible in evidence, and show that the . . . declarant is competent to testify on the matters
stated."  *Ostreicher v. Chase Bank USA, N.A.*, 19-CV-8175, 2020 WL 6809059, at *2 (S.D.N.Y.
Nov. 19, 2020) (quoting Fed. R. Civ. P. 56[c][4]).  "If a party fails to properly support an assertion
of fact . . . the court may: (1) give an opportunity to properly support . . . the fact; (2) consider the
fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and
supporting materials . . . show that the movant is entitled to it; or (4) issue any other appropriate
order."  Fed. R. Civ. P. 56(e).

    C.    **Parties' Briefing on Their Cross-Motions for Summary Judgment**

    1.    **Plaintiffs' Memorandum of Law in Chief**

Generally, in support of their motion for summary judgment, Plaintiffs assert five
arguments.  (Dkt. No. 56, Attach. 1.)  First, Plaintiffs argue, New York State's two-tiered
contribution-limit regime is subject to, and does not survive, rigorous and closely drawn scrutiny

for the following reasons: (a) because the making and receiving of campaign contributions is included within the First Amendment's free speech and associational rights, New York State may limit campaign contributions only to prevent *quid pro quo* corruption or its appearance; (b) Defendants have failed to adduce evidence that New York State's two-tiered contribution-limit regime is necessary to address a problem of actual or apparent *quid pro quo* corruption, particularly such corruption or its appearance related to Independent Bodies, (c) even if the contribution limit at issue in this action is shown to prevent actual or apparent *quid pro quo* corruption, Defendants must show that it is closely drawn and does not unnecessarily infringe constitutional rights; and (d) moreover, even if this contribution limit survives scrutiny under the First Amendment, it fails strict scrutiny under the Fourteenth Amendment's Equal Protection Clause because New York State's selective infringement of Independent Bodies' political speech neither serves a compelling interest nor is narrowly tailored to further that interest.  (*Id.*)

Second, Plaintiffs argue, New York State's housekeeping account exemption for Parties violates the First and Fourteenth Amendments for two reasons: (1) the housekeeping account exemption does not advance a sufficiently compelling state interest in that (a) a prohibition already exists on contributions from housekeeping accounts flowing to candidates and therefore no need exists (or has been shown) to prevent the housekeeping account exemption from being extended to Independent Bodies in order to prevent actual or apparent *quid pro quo* corruption, and (b) even if a need exists to prevent actual or apparent *quid pro quo* corruption, Defendants have not provided any evidence that Independent Bodies are uniquely susceptible to such corruption so as to justify a complete ban on them having housekeeping accounts (especially when Parties with housekeeping accounts can receive unlimited contributions), because there is no meaningful distinction between

17

the needs of the two kinds of organizations (and indeed there are actual examples of corruption in Parties and none in Independent Bodies); and (2) the housekeeping account exemption is not closely drawn or narrowly tailored in that (a) the New York State legislature needs but does not have evidence of actual or apparent *quid pro quo* corruption involving Independent Bodies, and (b) in any event, there are more closely drawn means than a complete ban to achieve New York State's anti-corruption interest (for example, the imposition on Independent Bodies of the same disclosure requirements that are imposed on Parties, the enactment of "anti-proliferation statutes" prohibiting individuals from establishing Independent Bodies when those individuals are connected to either Parties or other Independent Bodies, or the imposition of a housekeeping-account contribution limit).  (*Id*.)

Third, Plaintiffs argue, New York State's unequal contribution and coordination limits between Parties and Independent Bodies violate the First and Fourteenth Amendments for two reasons: (1) the unequal contribution and coordination limits do not advance a sufficiently compelling state interest, because (a) New York State does not have an anti-corruption interest in limiting contributions from a party to a party's candidate, and (b) even if party transfers to its candidates do trigger an anti-corruption interest, the New York State legislature did not possess evidence of a special actual or apparent *quid pro quo* corruption problem posed by Independent Bodies warranting disparate treatment as compared to Parties; and (2) in any event, the unequal contribution and coordination limits are not closely drawn or narrowly tailored to further an anti-corruption interest, because the Tenth and Eighth Circuits have declared unconstitutional lesser disparities in analogous contribution limits (between major and minor parties, and some political action committees and others).  (*Id*.)

18

Fourth, Plaintiffs argue, New York State's inequitable contribution limits as applied to Plaintiff Babinec's desire to contribute to Plaintiff UJP violates the First and Fourteenth Amendments for two reasons: (1) the inequitable contributions limits as applied to Plaintiff Babinec's desire to contribute to Plaintiff UJP do not advance a sufficiently compelling state interest of combatting actual or apparent *quid pro quo* corruption, because (a) an individual can contribute $117,300 to a Party such as the New York State Republican State Committee but is prohibited from making the same contribution to an Independent Body such as Plaintiff UJP, and (b) the New York State legislature has adduced no evidence of actual or apparent *quid pro quo* corruption to substantiate its divergent limits on the contributions an individual can make to a Party and those the individual can make to an Independent Body; and (2) the inequitable contribution limits as applied to Plaintiff Babinec's desire to contribute to Plaintiff UJP are not closely drawn or narrowly tailored, because New York State can achieve its goals through less-intrusive means (for example, again, the imposition on Independent Bodies of the same disclosure requirements that are imposed on Parties, the enactment of "anti-proliferation statutes" prohibiting individuals from establishing Independent Bodies when those individuals are connected to either Parties or other Independent Bodies, or the enactment of statutes requiring that contributions to Independent Bodies from individuals who have contributed the maximum amount to candidates be placed in a separate bank account and spent on activities in which the money is not directly flowing to the candidate such as "Get Out the Vote" efforts and signature gathering). (*Id.*)

Fifth, and finally, Plaintiffs argue, Defendants lack, and are unable to produce, evidence of actual or apparent *quid pro quo* corruption in Plaintiff UJP and the Upstate Jobs Committee for three reasons: (1) the two entities have separate and distinct boards of directors; (2) the two entities

have separate and distinct bank accounts, budgets and budget-spending decision-making processes; and (3) the two entities have two-part firewall policies to prevent coordination, and both policies are enforced.  (*Id*.)

### 2.    Defendants' Combined Opposition Memorandum of Law and Memorandum of Law in Chief

Generally, in opposition to Plaintiffs' motion and in support of their own cross-motion for summary judgment, Defendants assert four arguments.  (Dkt. No. 57, Attach. 8.)  First, Defendants argue, the nature of Plaintiffs' challenge triggers two different legal standards: (1) because Plaintiffs' claims challenge only contribution limits and not also expenditure limits, those claims are subject to intermediate scrutiny (requiring that the limits be closely drawn to address a sufficiently important state interest, specifically, actual or apparent *quid pro quo* corruption); and (2) because Plaintiffs' claims challenge only the relevant statutes' facial validity, and not also the statutes' application to Plaintiffs, Plaintiffs must meet a strict standard to upset these laws.  (*Id*.)

Second, Defendants argue, Plaintiffs' claims challenging New York State's laws regarding housekeeping accounts must be dismissed for two reasons: (1) the Court has already ruled that New York State's election laws regarding housekeeping accounts serve to prevent, at a minimum, the appearance of *quid pro quo* corruption, and that those laws are narrowly tailored to prevent the appearance of *quid pro quo* corruption; and (2) far from constituting new evidence warranting reconsideration of the Court's prior ruling, the evidence adduced by Plaintiffs in support of their motion actually shows (a) the potential for *quid quo pro* corruption if their request for relief is granted, and (b) the fact that Plaintiffs have been fully able to carry out their desired activities within the election laws' current framework.  (*Id*.)

Third, Defendants argue, Plaintiffs' claims challenging New York State's laws regarding

contribution limits must be dismissed for two reasons: (1) Plaintiffs have failed to establish their First Amendment claims with respect to the contribution limits, because (a) the First Amendment claims turn on whether there has been a showing that the limits are so low as to impede the ability of the candidates to amass the resources necessary for effective advocacy, (b) Plaintiffs have not made such a showing here and, indeed, Plaintiff Babinec has not donated the current maximum allowable amount to Plaintiff UJP, and (c) if Plaintiffs' requested relief were granted, any individual with sufficient resources could use an Independent Body as a mask for his or her own donations to a candidate, thereby sidestepping the current limitations on an individual's donations to a candidate; and (2) Plaintiffs have failed to establish their Fourteenth Amendment equal protection claims with respect to the contribution limits, because they have presented no evidence or authority establishing that Independent Bodies are similarly situated to Parties, which the Supreme Court has recognized occupy a unique position in our democracy, particularly for the purpose of preventing actual or apparent *quid pro quo* corruption.  (*Id.*)

Fourth, and finally, Defendants argue, to the extent that Plaintiffs still pursue a claim regarding their challenge to contribution limits in a primary election (which they do not discuss in their motion papers), that claim should be dismissed, because (a) Independent Bodies are not required to conduct primary elections, and (b) in any event, Parties do not receive an additional contribution limit for primary elections.  (*Id.*)

### 3.      Plaintiffs' Combined Reply Memorandum of Law and Opposition Memorandum of Law

Generally, in reply to Defendants' opposition and in opposition to Defendants' motion, Plaintiffs assert four arguments.  (Dkt. No. 59.)  First, Plaintiffs argue, notwithstanding Defendants' persistent attempt to advance a less-exacting standard of scrutiny, New York State's

two-tiered contribution-limit regime must survive (and yet fails to survive) rigorous and closely

drawn scrutiny under the First Amendment (demonstrating a sufficiently important interest to

justify its restrictions, and the employment of closely drawn means to avoid unnecessary

abridgement of associational freedoms), for four reasons: (1) the Supreme Court has clearly stated

that this is the appropriate standard in cases challenging a state's discriminatory contribution

limits, and the Second Circuit has recognized that this the proper standard to apply in this case; (2)

contrary to Defendants' characterization of Plaintiffs' claims, Plaintiffs' claim that New York

State's unequal contribution limits regime is analytically distinct from a claim that New York

State's contribution limits are too low; (3) not only have Defendants failed to demonstrate that

New York State is acting to further its interest in preventing actual or apparent *quid pro quo*

corruption, they have failed to supply evidence to prove that the means it has chosen does not

unnecessary abridge First Amendment rights; and (4) contrary to Defendants' characterization,

Plaintiffs' claims challenge the relevant statutes' application to Plaintiffs.  (*Id.*)

Second, Plaintiffs argue, Defendants have failed to carry their burden to justify New York

State's prohibition on Independent Bodies obtaining a housekeeping account for four reasons: (1)

extending New York State's housekeeping accounts to Independent Bodies would not trigger an

anti-corruption interest, because, as argued in Plaintiffs' memorandum of law in chief, a

prohibition already exists on contributions from housekeeping accounts flowing to candidates; (2)

even if Defendants had demonstrated the triggering of such an anti-corruption interest, again as

Plaintiffs have previously argued, Defendants have not adduced evidence that Plaintiff UJP or

Independent Bodies present a unique threat of *quid pro quo* corruption to justify a complete ban;

(3) in any event, New York State's ban on Independent Bodies establishing housekeeping accounts

22

is not closely drawn, because, as Plaintiffs have previously argued, (a) Defendants have produced no evidence of actual or apparent *quid pro quo* corruption involving Independent Bodies that would enable the Court to assess whether the complete ban is narrowly tailored, and (b) New York State can achieve its goals through less-intrusive means, none of which Defendants have even bothered to address in their opposition memorandum of law; and (4) Defendants' arguments to the contrary are unavailing because (a) the fact that this Court denied Plaintiffs' motion for a preliminary injunction (based on not-fully-developed record evidence) is irrelevant, (b) Defendants' fears about permitting housekeeping accounts for Independent Bodies are overstated and speculative in that the housekeeping account provision (which already prohibits contributions from housekeeping accounts from flowing to specific candidates) is further buttressed by its disclosure provision, (c) Defendants' argument that Plaintiffs have carried out similar functions without a housekeeping account is not evidence that the statute's prohibition is closely drawn, given that a donor need not max out on his or her current contribution limit in order to challenge the constitutionality of that limit (and in any event Defendants' argument actually undermines their position that eliminating the two-tiered system would pose a threat of actual or apparent *quid pro quo* corruption), and (d) the fact that Parties need housekeeping accounts (given their increased costs) does not constitute the advancement a permissible interest, the only one of which is the prevention of actual or apparent *quid pro quo* corruption. (*Id*.)

Third, Plaintiffs argue, Defendants have failed to adduce evidence to justify New York State's differential contribution limits as applied to Plaintiff Babinec for four reasons: (1) the Supreme Court has already ruled that imposing different contribution and coordinated party expenditure limits on candidates vying for the same seat is antithetical to the First Amendment,

23

and Defendants have adduced no legislative history or other evidence to justify this disparity on the grounds of preventing actual or apparent *quid pro quo* corruption; (2) as they did with regard to the limit on housekeeping accounts, Defendants have failed to adduce evidence that would permit the Court to assess the differing contribution limits' fit to ensure that Plaintiffs' First Amendment rights were not being unnecessarily abridged (and indeed Defendants do not even address Plaintiffs' proposed closely drawn alternatives); (3) Plaintiff Babinec's contribution history to Plaintiff UJP, and his position at Plaintiff UJP, is not relevant to determining whether New York State's contribution limit imposed on his contributions to Plaintiff UJP is constitutional because (a) Defendants' hypothetical scenarios if the difference in contribution limits was abolished (e.g., the making of contributions to evade the contributions limits) are already illegal and thus may not be used to justify contribution limits, (b) Defendants have neither presented evidence that Plaintiff UJP has abused the contribution limits nor presented evidence that people use Independent Bodies to abuse the contribution limits, and (c) any concerns about using an Independent Body to evade contribution limits are alleviated by the fact for Independent Bodies to get their candidate's name on a ballot, they must endure the independent-nominating-petition process, which is both costly and arduous; and (4) Independent Bodies are similarly situated to Parties for purposes of Plaintiffs' Fourteenth Amendment equal protection claim, because (a) according to their definitions under New York State law, both groups compete for votes from the public for their nominated candidates in a general election, (b) there is nothing unique about Parties other than their size, and (c) Defendants misread the cases they rely on, and fail to distinguish controlling cases.  (*Id*.)

Fourth, Plaintiffs argue, Defendants have failed to adduce evidence justifying New York State's differential contribution limits in general for two reasons: (1) as a threshold matter,

Defendants have failed to adduce evidence establishing that New York State's differing contribution limits further its interest in preventing actual or apparent *quid pro quo* corruption; and (2) in any event, Defendants have failed to adduce evidence that New York State's differing contribution limits are closely drawn so as to not unnecessarily abridge First Amendment freedoms.  (*Id*.)

### 4.      Defendants' Reply Memorandum of Law

Generally, in reply to Plaintiffs' opposition, Defendants assert four arguments.  (Dkt. No. 67.)  First, Defendants argue, Plaintiffs mischaracterize the nature of their claims and the legal standard governing them for two reasons: (1) contrary to Plaintiffs' argument that they do not "quibble with the precise limits imposed on Independent Bodies or Political Parties in New York," Plaintiffs' Complaint repeatedly claims that the sufficiency of New York State's contribution limits on Plaintiffs UJP and Babinec are insufficient; and (2) contrary to Plaintiffs' argument that Defendants must prove (but have not proven) that Plaintiff UJP or Independent Bodies are actually corrupt, Defendants need only show that the challenged laws serve to prevent the *appearance* of *quid pro quo* corruption, which Defendants have done by showing that an Independent Body (such as Plaintiff UJP) that is operated by an individual who is less scrupulous than Plaintiff Babinec could create the risk of *quid pro quo* corruption (e.g., where that individual is a director and the largest donor of both that Independent Body and its independent expenditure-only committee).  (*Id*.)

Second, Defendants argue, the laws at issue are narrowly tailored for two reasons: (1) it does not matter that three other means of enforcement could have equally prevented *quid pro quo* corruption, but whether the challenged laws unnecessarily abridge associational freedoms; and (2)

here, the evidence demonstrates that the challenged laws do not unnecessarily abridge Plaintiff UJP's and Plaintiff Babinec's rights (Plaintiff Bullis' rights no longer apparently being at issue, due to Plaintiffs' failure to assert arguments regarding them), for example, the evidence that Plaintiff UJP has been able to enlist employees, hold informational gatherings and support candidates.  (*Id.*)

Third, Defendants argue, the Court should reject Plaintiffs' reliance on the fact that the law already prohibits housekeeping accounts from being used for the direct benefit of candidates (and their resulting argument that extending those housekeeping accounts to Independent Bodies would not trigger an anti-corruption interest) for three reasons: (1) Plaintiffs confuse whether housekeeping accounts *should* be so used with whether they *will* be so used; and (2) if Plaintiffs' request for relief were granted, a group as small as two individuals with only a single candidate would be allowed to fundraise for a housekeeping account (and it would be possible, if not probable, that the money in that account would be used for the benefit of a single candidate); and (3) although Plaintiffs argue that the aforementioned risk could be eliminated by the Board of Elections devoting more manpower to enforcement, that increase in cost must be balanced against the fact that the current law has not significantly restricted Plaintiffs' rights (or the rights of any other Independent Body).  (*Id.*)

Fourth, Defendants argue, contrary to Plaintiffs' argument that Defendants have offered no explanation as to why Independent Bodies and Parties are not similarly situated, Defendants have explained that (1) Plaintiff UJP is not a Party but an Independent Body under New York State law, (2) the Supreme Court has specifically recognized that Parties occupy a unique place in our democracy, and (3) Parties are more tightly organized than Independent Bodies.  (*Id.*)

26

### D.      Parties' Briefing on Plaintiffs' Motions to Exclude

#### 1.      Plaintiffs' Motion to Exclude the Declaration and Testimony of Brian Quail

Generally, in support of their motion to exclude the declaration and testimony of Brian Quail, Plaintiffs assert the following three arguments: (1) Mr. Quail is not qualified to serve as an expert in this case because (a) he has never published a law review article or any peer-reviewed articles about New York Election Law, (b) he has never before served as an expert witness and (c) he is not a non-partisan answerable to his profession in that he has previously served only for Democratic commissions; (2) legal conclusions pervade Mr. Quail's declaration and testimony because (a) Paragraph 6 of his declaration instructs the Court on how New York Election Law categorizes political entities (which does not require specialized knowledge), (b) Paragraphs 8, 10, 11 and 14 discuss the legal duties and obligations of parties and the contribution limits for various entities under New York Election Law (thus invading the Court's exclusive province to say what the law is), (c) Paragraphs 15, 16 and 17 restate New York State's housekeeping account exception statute and state what types of entities have legal obligations under state law, and (d) Paragraphs 18 and 19 attempt to divine legislative intent, misstate the relief sought and couch a legal opinion in terms of art; and (3) Mr. Quail's declaration and testimony are not reliable, because (a) Paragraphs 9, 11 and 17 through 21 contain conclusory assertions that are not supported by sufficient facts and data and are the product of unreliable methods, and (b) those paragraphs provide only unadorned conclusions unsupported by facts.  (Dkt. No. 60, Attach. 1.)

Generally, in opposition to Plaintiffs' motion, Defendants assert the following two arguments: (1) Mr. Quail's qualifications allow him to offer an expert opinion on this matter because, although he has not published any articles or previously appeared as an expert, he has

nineteen years of experience as a practicing attorney, fourteen years of experience working with New York Election Law, and eight years of experience as an Election Commissioner (thus giving him unique insight into the potentially complicated scenarios presented by New York Election Law); (2) Plaintiffs' arguments are insufficient to disqualify Mr. Quail as an expert because (a) his opinions are supported by a substantial body of material that has been provided to Plaintiffs, (b) although some his opinions may touch on an ultimate issue to be decided in this complicated and nuanced field of law, they do not tell the trier of fact what result it should reach, and (c) his opinions thus affect the weight to be given to Mr. Quail's opinion, not his qualifications as an expert.  (Dkt. No. 63.)

Generally, in reply to Defendants' opposition, Plaintiffs assert the following three arguments: (1) the First Amendment to the U.S. Constitution, and its applications to campaign finance statutes, is not a particularly complicated or nuanced field such that a legal expert is necessary to assist the trier of fact; (2) Defendants' proffer of Mr. Quail as an expert to explain the relevant laws is impermissible because it is the role of the Court (which comes already equipped with a legal expert, i.e., a judge) to say what the law is, and Mr. Quail, as an attorney representing two of the Defendants, is far from a non-lawyer expert witness testifying about facts; and (3) and even if the Court were to permit Mr. Quail to testify as an expert, the Court should afford his testimony little, if any, weight because Mr. Quail is not a non-partisan expert answerable to his profession.  (Dkt. No. 66.)

   **2.**  **Plaintiffs' Motion to Exclude the Expert Report of Dr. Clyde Wilcox**

Generally, in support of their' motion to exclude the expert report of Dr. Clyde Wilcox, Plaintiffs assert the following three arguments: (1) Dr. Wilcox's report is irrelevant and unhelpful

because (a) to justify unequal treatment of different groups, Defendants must adduce evidence that the New York State legislature sought to solve a problem at the time the law was enacted, (b) other than pointing to the statutes themselves, the State of New York has never offered such evidence, (c) instead, Defendants attempt to use Dr. Wilcox to create a post hoc legislative reasoning to buttress the election laws' infirmities, and (d) Dr. Wilcox's report is not relevant to the question of what evidence the legislature considered when passing the challenged statutes in that there is no evidence the legislature considered anything to justify its ban on Independent Bodies' housekeeping accounts and unequal contribution and coordination limits; (2) Dr. Wilcox's report is not based on reliable principles and methods, and the methods used have not been reliably applied to the facts, because (a) Dr. Wilcox habitually copied material from his reports in unrelated and factually distinct cases for use in this case, and (b) Dr. Wilcox's extensive use of anecdotal evidence is a departure from academic norms; and (3) Dr. Wilcox is not qualified to be an expert on the subject matter in his report (and therefore his report is not helpful) because (a) Dr. Wilcox is not an expert regarding political parties (especially in New York State) and was unable to even articulate, as a political scientist, what would make one group a political party and another collection of people a mere group, (b) Dr. Wilcox is not an expert on housekeeping accounts nor does he even have a firm understanding of New York Election Law, and (c) indeed his report confuses the purported corrupting influence of money on independent bodies with the corrupting influence of money on political parties.  (Dkt. No. 62.)

Generally, in opposition to Plaintiffs' motion to exclude Dr. Wilcox, Defendants assert the following three arguments: (1) Dr. Wilcox's qualifications allow him to offer an expert opinion in this matter because courts have qualified experts in election matters with far fewer credentials than

Dr. Wilcox (who has taught political science in college since 1986, has published widely on the subject on campaign finance, and has previously served as an expert witness on campaign finance); (2) Plaintiffs' remaining arguments are insufficient to disqualify Dr. Wilcox as an expert because (a) an expert can provide information to buttress legislative decision making, which Dr. Wilcox has done here, (b) Dr. Wilcox's copying of material from other reports occurred in only a handful of sentences, (c) the evidence relied on by Dr. Wilcox was not "anecdotal" but directly at issue in this case, (d) courts recognize that, in disciplines such as political science, an expert's experience and relevant publications on the topic are sufficient bases for  the expert's opinion (and Dr. Wilcox has provided substantial citations to publications to support his opinions), and (e) thus Plaintiffs' arguments go to the weight, not admissibility, of Dr. Wilcox's report.  (Dkt. No. 63, at 1-9.)

Generally, in their reply to Defendants' opposition, Plaintiffs focus solely on responding to Defendants' opposition to Mr. Quail's declaration and testimony.  (*See generally* Dkt. No. 66.)

## II.    RELEVANT LEGAL STANDARDS

### A.    Legal Standard Governing Motions for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[10]  As for the materiality requirement, a dispute of fact is

---

[10]      As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].  As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co.,*

"material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes

that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all

ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255.  In

addition, "[the movant] bears the initial responsibility of informing the district court of the basis

for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s]

the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24

(1986).  However, when the movant has met its initial burden, the non-movant must come forward

with specific facts showing a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(a), (c),

(e).[11]

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant

willfully fails to respond to a motion for summary judgment, a district court has no duty to perform

an independent review of the record to find proof of a factual dispute.  Of course, when a non-

movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been

no [such] response . . . does not . . . [by itself] mean that the motion is to be granted

automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).  Rather, as indicated above,

the Court must assure itself that, based on the undisputed material facts, the law indeed warrants

judgment for the movant.  *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group,*

*Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

[11]     Among other things, Local Rule 56.1 (previously Local Rule 7.1[a][3]) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 56.1.

*Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3).  What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 (previously Local Rule 7.1[a][3]) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.[12]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[13]  Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden.  *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.)

---

[12]      *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases).

[13]      *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]); *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

(collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

**B.     Legal Standard Governing Motions to Preclude Expert Evidence**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Specifically, Fed. R. Evid. 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of opinion or otherwise if:
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> **(b)** the testimony is based upon sufficient facts or data;
> **(c)** the testimony is the product of reliable principles and methods; and
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

From this rule, the Supreme Court and Second Circuit have derived the following legal standard.  As an initial matter, generally, the trial judge is to act as a "gatekeeper," charged with determining whether the proffered testimony satisfies a number of standards, including, among other things, that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact understand the evidence or to determine a fact in issue."  *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135 (2d Cir. 2013) (quoting Fed. R. Evid. 702[a]).  "In other words, '[e]xpert testimony must be helpful to the [trier of fact] in comprehending and deciding issues beyond the understanding of a layperson.'"  *Marvel Characters, Inc.*, F.3d at 135 (quoting *DiBella v. Hopkins*, 403 F.3d 102, 121 [2d Cir. 2005]).

33

Additionally, the proposed expert must be "qualified" to give the proffered opinion. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 & nn.7, 10 (1992). "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *U.S. v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). In assessing whether a proposed expert is "qualified," the trial judge should remember the "liberal[ ] purpose" of Fed. R. Evid. 702, and remain "flexibl[e]" in evaluating the proposed expert's qualifications. *See U.S. v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985) (holding that Fed. R. Evid. 702 "must be read in light of the liberalizing purpose of the rule"); *Lappe v. Am. Honda Motor Co., Inc.*, 857 F. Supp. 222, 227 (N.D.N.Y. 1994) (Hurd, M.J.) ("[L]iberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications."), *aff'd without opinion*, 101 F.3d 682 (2d Cir. 1996). Having said that, of course, "a district court may properly conclude that witnesses are insufficiently qualified . . . [where] their expertise is too general or too deficient." *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997), *accord*, *Dreyer v. Ryder Auto. Carrier Grp., Inc.*, 367 F. Supp. 2d 413, 425-26 (W.D.N.Y. 2005); *Byrne v. Liquid Asphalt Sys., Inc.*, 238 F. Supp. 2d 491, 494 (E.D.N.Y. 2002); *Trumps v. Toastmaster, Inc.*, 969 F. Supp. 247, 252 (S.D.N.Y. 1997); *see, e.g.*, *McCullock v. H.B. Fuller Co.*, 981 F.2d 656, 657-58 (2d Cir. 1992) (affirming district court's ruling that plaintiff's proffered expert did not possess the required qualifications to testify as an expert on the subject of warning labels for hot melt glue).

Finally, a witness qualified as an expert will be permitted to testify if his or her testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." *U.S. v.*

*Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (quoting Fed. R. Evid. 702).  Of course, "the court's

review of the record is limited to facts that would be admissible at trial."  *Melini v. 71st Lexington*

*Corp.*, 07-CV-0701, 2009 WL 413608, at *3 (S.D.N.Y. Feb. 13, 2009).  "To be admissible, expert

testimony must be both relevant and reliable."  *Melini*, 2009 WL 413608, at *4 (citing *Daubert*,

509 U.S. at 589 [1993].)  Regarding this requirement of reliability, "expert opinion testimony must

be (1) 'based on sufficient facts or data,' (2) 'the product of reliable principles and methods,' and

(3) the result of applying those principles and methods to the facts of the case in a reliable

manner."  *Id*. at *4 (quoting Fed. R. Evid. 702).  "The proponent of expert testimony must

establish its admissibility by a preponderance of the evidence."  *Id*. (citing *Astra Aktiebolag v.*

*Andrx Pharm., Inc.*, 222 F. Supp. 2d 423, 487 (S.D.N.Y. 2002) [citing Fed. R. Evid. 104(a)].)

      In *Daubert*, the Supreme Court set forth a non-exclusive list of factors for a trial court to

use when assessing the reliability of expert testimony: (1) whether the expert's technique or theory

can be, or has been, tested–that is, whether the expert's theory can be challenged in some objective

sense, or whether it is instead a subjective, conclusory approach that cannot reasonably be assessed

for reliability; (2) whether the technique or theory has been subject to peer review and publication;

(3) the known or potential rate of error of the technique or theory when applied; (4) the existence

and maintenance of standards and controls; and (5) whether the technique or theory has been

generally accepted in the scientific community.  *Daubert*, 509 U.S. at 593-94; *see also* Fed. R.

Evid. 702, Advisory Committee Notes: 2000 Amendments.

      In addition, [c]ourts both before and after *Daubert* have found other factors relevant in

determining whether expert testimony is sufficiently reliable to be considered by the trier of fact."

Fed. R. Evid. 702, Advisory Committee Notes: 2000 Amendments.  These factors include the

following: (1) whether the expert is "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purposes of testifying"; (2) whether the expert has unjustly extrapolated from an accepted premise to an unfounded conclusion; (3) whether the expert has adequately accounted for obvious alternative explanations for the plaintiff's condition; and (4) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

In sum, the Second Circuit has explained the trial court's duties when evaluating expert testimony in the following manner:

> First, . . . *Daubert* reinforces the idea that there should be a presumption of admissibility of evidence.  Second, it emphasizes the need for flexibility in assessing whether evidence is admissible.  Rather than using rigid 'safeguards' for determining whether testimony should be admitted, the Court's approach is to permit the trial judge to weigh the various considerations pertinent to the issue in question.  Third, *Daubert* allows for the admissibility of scientific evidence, even if not generally accepted in the scientific community, provided its reliability has independent support. Finally, the Court expressed its faith in the power of the adversary system to test 'shaky but admissible' evidence, and advanced a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable.

*Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995) (internal citations omitted).  "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).  Instead, "the rejection of expert testimony is the exception rather than the rule."  Fed. R. Evid. 702, Advisory Committee's Note; *see also E.E.O.C. v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451, 456 (S.D.N.Y. 2004); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union*, 313 F. Supp. 2d 213, 226 (S.D.N.Y. 2004).  "This principle is based on the

36

recognition that 'our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony.'" *Melini*, 2009 WL 413608, at *5 (quoting *Amorgianos*, 303 F.3d at 267).

However, "when an expert opinion is based on data, methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266; *accord*, *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005). Furthermore, "it is critical that an expert's analysis be reliable at every step." *Amorgianos*, 303 F.3d at 267. Of course, "the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Id.* at 266 (citing *Daubert*, 509 U.S. at 595). Nevertheless, "conclusions and methodology are not entirely distinct from one another." *Gen. Elec. Co., v. Joiner*, 522 U.S. 136, 146 (1997). Accordingly, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146.

## III.   ANALYSIS

### A.   Whether Brian Quail's Declaration and Testimony and Dr. Clyde Wilcox's Expert Report and Testimony Should Be Stricken

As a threshold matter, the Court must determine whether Brian Quail's declaration and testimony and Dr. Clyde Wilcox's expert report and testimony should be stricken for purpose of the parties' cross-motions for summary judgment (and trial). (Dkt. No. 30, Attach. 27.) After carefully considering the matter, the Court answers this question in the affirmative in part and the negative in part with respect to the declaration and testimony of Mr. Quail, and in the negative

with respect to the expert report and testimony of Dr. Wilcox, mainly for the reasons stated in
Defendants' memoranda of law.  To those reasons, the Court adds the following analysis, which is
intended to supplement, and not supplant, Defendants' reasons.

### 1.    Qualifications

As Defendants argue, Mr. Quail has been a practicing attorney in the State of New York for
approximately nineteen years.  (Dkt. No. 63, Attach. 5, at 15.)  During Mr. Quail's tenure as an
attorney, he has acquired approximately fourteen years' experience working in election law,
having previously served as an Election Commissioner for Schenectady County for eight years and
serving as co-counsel of the New York State Board of Elections since 2014.  (Dkt. No. 57, Attach.
4, at ¶¶ 2-3.)  Although Mr. Quail has not published any articles or previously appeared as an
expert, his proposed expertise is based upon his professional and personal experience with New
York Election Law.  (Dkt. No. 57, Attach. 4; Dkt. No. 63, Attach. 5.)  Given Mr. Quail's
experience as an attorney who specializes in New York State election law, the Court finds that he
is qualified to testify as an expert on New York Election Law.

As Defendants also argue, Dr. Wilcox has been teaching in the field of political science
since 1986.  (Dkt. No. 57, Attach. 3, at 14.)  Furthermore, in reviewing Dr. Wilcox's thirty-page
resume, the Court notes that he has written extensively on campaign finance and has co-authored
multiple books on issues related to this case, including, but not limited to: (1) *Serious Money:
Fundraising and Contributing in Presidential Nomination Campaigns*, (2) *Interest Groups in
American Campaigns: The New Face of Electioneering*, and (3) *The Interest Group Society*.  (*Id.*
at 15-16.)  Although not an expert on New York State election law, New York State Campaign
Finance law, or political parties, Dr. Wilcox has previously served as an expert witness on

campaign finance and interest group cases for the Federal Election Commission, the Justice

Department, and the Attorney General for the State of New York, in addition to serving as a

background consultant in other federal cases.  (*Id*. at 2-3.)  Given Dr. Wilcox's education,

experience, and publication history in the areas of political contributions and *quid pro quo*

corruption, the Court finds that he is sufficiently qualified as an expert in the general field of

political science and the general field of campaign finance.

### 2.    Reliability of Expert Opinions

As indicated above in Part II.B. of this Decision and Order, "[o]nce the proposed expert has

'crossed the foundational threshold of establishing his personal background qualifications as an

expert, he must then provide further foundational testimony as to the validity and reliability of his

theories.'"  *Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 242 (E.D.N.Y. 2014) (quoting

*Berry v. Crown Equip. Corp.*, 108 F. Supp. 2d 743, 749 [E.D. Mich. 2000]).  Under Fed. R. Evid.

702, "an expert with 'specialized knowledge [that] will help the trier of fact' may testify so long as

that testimony is 'based on sufficient facts or data' and 'is the product of reliable principles and

methods' that the witness has 'reliably applied . . . to the facts of the case."  *In re Vivendi, S.A. Sec.

Litig.*, 838 F.3d 223, 253 (2d Cir. 2016) (quoting Fed. R. Evid. 702).  "[T]he reliability analysis

applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's

opinion, the link between the facts and the conclusion, *et alia*."  *Heller v. Shaw Indus., Inc.*, 167

F.3d 146, 155 (3d Cir. 1999); *Amorgianos*, 303 F.3d at 267.  Again, "[t]he proponent of the expert

testimony bears the burden of establishing these admissibility requirements, and the district court

acts as a 'gatekeeper' to ensure that the 'expert's testimony both rests on a reliable foundation and

is relevant to the task at hand.'"  *In re Vivendi*, 838 F.3d 253 (quoting *United States v. Williams*,

506 F.3d 151, 160 [2d Cir. 2007]).  "The district court has broad discretion to carry out this gatekeeping function," and "[i]ts inquiry is necessarily a 'flexible one.'" *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) (quoting *Daubert*, 509 U.S. at 594).  Expert opinions must be excluded where district courts "conclude that there is simply too great of an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Here, Mr. Quail's declaration and testimony present a close call.  In his declaration, Mr. Quail stated that his opinions therein were "based on . . . [his] [twelve years of] [professional] experience with . . . campaign finance and election administration" in New York State.  (Dkt. No. 57, Attach. 4, at ¶¶ 1-2.)  Similarly, in his deposition, Mr. Quail testified that, in drafting his declaration and/or in preparing his testimony, he relied on his professional experience, as well as 328 documents produced by Defendants during discovery (which include legislative history, a law review article, and material from the National Conference of State Legislators, among other things).  (Dkt. No. 56, Attach. 3, at 399-404, 445-47, 455-63.)  Granted, "[a]n expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006).  "Expert testimony must rest on 'more than subjective believe or unsupported speculation." *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 307 (S.D.N.Y. 2015) (quoting *Daubert*, 509 U.S. at 599).  Furthermore, Mr. Quail does not appear to have relied on many (if any) of the 328 documents in drafting his declaration.  However, the Court finds that Defendants have, albeit barely, produced enough information to permit Plaintiffs to adequately challenge Mr. Quail's opinions, as evidenced by Plaintiffs' lengthy examination of him on the subject of the bases for his expert opinion during his deposition (despite their choice to not explore the nature of Mr. Quail's

professional experience). (Dkt. No. 56, Attach. 3, at 455-75.)  Simply stated, Plaintiffs' challenges

affect the weight, not admissibility, of Mr. Quail's declaration and testimony.  Accordingly, the

Court concludes that, except to the extent his opinions are not based on his professional

experience, Mr. Quail's declaration and testimony are sufficiently reliable.

Turning to Dr. Wilcox's expert report and testimony, Plaintiffs argue, in part, that Dr.

Wilcox's expert report and testimony are not based on reliable principles and methodology

because he habitually copied material from his reports in unrelated and factually distinct cases, in

addition to departing from academic norms by providing extensive anecdotal evidence.  (Dkt. No.

62, at 10-12.)  Plaintiffs argument is misplaced in that it again goes to the weight, not

admissibility, of Dr. Wilcox's expert report and testimony.  *See Cedar Petrochemicals, Inc. v.*

*Dongbu Hannon Chem. Co., Ltd.*, 769 F. Supp. 2d 269, 285 (S.D.N.Y. 2011) ("Questions over

whether there is a sufficient factual basis for an expert's testimony may go to weight, not

admissibility.") (internal quotation marks omitted).  "Vigorous cross-examination, presentation of

contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate

means of attacking shaky, but admissible evidence." *Daubert*, 508 U.S. at 596.  Plaintiffs are free

to cross-examine Dr. Wilcox about his "extensive anecdotal evidence" and the extent to which he

copied material from his previous reports in factually distinct cases.  Having analyzed Dr.

Wilcox's principles and methodology (namely the reliance on his expertise in campaign finance

and the expertise of other political scientists), the Court concludes that Dr. Wilcox's expert report

and testimony are reliable.

### 3.     Whether Expert Opinions Assist the Trier of Fact

When evaluating the third and final prong of the legal standard set forth in Fed. R. Evid.

702 (i.e., whether the proposed expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue), courts often analyze whether the proposed expert testimony is, in addition to being admissible, relevant under Fed. R. Evid. 401 and not unfairly prejudicial or confusing under Fed. R. Evid. 403. *Kellwood Co.*, 105 F. Supp. 3d at 308.

In this case, Mr. Quail's declaration ranges from testifying about the number of Parties recognized by New York State, to describing the nature of New York State election law, to opining about the compliance requirements created in various hypothetical scenarios, to opining about an increase of the risk of *quid pro quo* corruption. (*See generally* Dk. No. 57, Attach. 4.) Granted, the declaration is improperly sprinkled with legal conclusions. *See Jones v. Midland Funding, LLC*, 616 F. Supp. 2d 224, 227 (D. Conn. 2009) ("'[A]n expert should not be permitted to express an opinion that is merely an interpretation of . . . statutes or regulations, as that is the sole province of the Court.'") (quoting *DeGregorio v. Metro-North R. Co.*, 05-CV-0533, 2006 WL 3462554, at *3 [D. Conn. Nov. 1, 2006]). However, the Court finds that, except to the extent that it offers legal conclusions, Mr. Quail's declaration and testimony would indeed assist the Court in navigating New York Election Law.

Turning to Dr. Wilcox's expert report and intended testimony, the Court finds it is limited to a discussion of campaign finance, *quid pro quo* corruption and its appearance, and housekeeping accounts; he has conceded that he is not an expert in New York Election Law or New York State campaign finance law. (Dkt. No. 57, Attach. 2, at 28-29.) The Court further finds that Dr. Wilcox's expert report and testimony will help the trier of fact to understand the benefits of limiting *quid pro quo* corruption, as well as the appearance of *quid pro quo* corruption, with regard

42

to housekeeping accounts and campaign finance generally.  This understanding will help the trier of fact to discern the difference (if any) between the danger of *quid pro quo* corruption (and its appearance) in Parties and the danger in Independent Bodies.  Again, simply stated, the Court finds that Plaintiffs' challenges to Dr. Wilcox's expert report and intended testimony again affect the weight, not admissibility, of Dr. Wilcox's expert conclusions.  (Dkt. No. 62.)

For all of these reasons, the Court denies Plaintiffs' motion to exclude Mr. Quail's declaration and testimony to the extent they are based on his professional experience, and grants the motion to the extent Mr. Quail's declaration and testimony are not based on his professional experience or offer legal conclusions; and the Court denies Plaintiffs' motion to exclude Dr. Wilcox's expert report and testimony.

**B.**     **Whether Plaintiffs or Defendants Are Entitled to Summary Judgment on Plaintiffs' Claims**

**1.**     **Substantive Legal Standard**

**a.**     **Plaintiffs' Claims Under the First Amendment**

As the Second Circuit has acknowledged, the merits of Plaintiffs' challenge "raise serious questions" regarding the appropriate standard of judicial review.  *Upstate Jobs Party v. Kosinski*, 741 App'x 838, 839 (2d Cir. 2018).  For the benefit of the parties (and for the purpose of any appeal), the Court explains below the standard of review it has applied throughout this Decision and Order.

In *McCutcheon v. Fed. Election Comm'n*, the Supreme Court stated that "[t]he right to participate in democracy through political contributions is protected by the First Amendment, but that right is not absolute," and that legislative bodies "may regulate campaign contributions to protect against corruption or the appearance of corruption." 572 U.S. 185, 191 (2014) (citing

*Buckley v. Valeo*, 424 U.S. 1, 26-27 [1976]).  One type of corruption that the Supreme Court has extensively addressed is financial *quid pro quo* corruption and the appearance thereof.  *See Fed. Election Comm'n v. Nat'l. Conservative Political Action Comm.*, 470 U.S. 480, 497 (1985) ("The hallmark of corruption is the financial *quid pro quo*: dollars for political favors.").  The phrase *quid pro quo* "captures the notion of a direct exchange of an official act for money." *McCutcheon*, 572 U.S. at 192.

In *Buckley*, "the Court concluded that contribution limits impose a lesser restraint on political speech [than do expenditure limits] because they 'permit[] the symbolic expression of support evidenced by a contribution but do[] not in any way infringe on the contributor's freedom to discuss the candidates and issues.'" *McCutcheon*, 572 U.S. at 197 (quoting *Buckley*, 424 U.S. at 21).  As a result, the Supreme Court "applied a lesser but still 'rigorous standard of review'" with regard to contribution limits than with regard to expenditure limits.  *Id.* (quoting *Buckely*, 424 U.S. at 29).  Under this lesser-but-still-rigorous standard, a "significant interference with protected rights of political association may be sustained if the State demonstrates a sufficiently important interest and employs means *closely drawn* to avoid unnecessary abridgement of associational freedoms." *Id.* (quoting *Buckley*, 424 U.S. at 25) (internal quotation marks omitted and emphasis added).  Accordingly, courts "must assess the fit between the stated government objective and the means selected to achieve that objective." *Id.* at 199.  Although the Supreme Court does not require strict scrutiny, it still requires a "'fit that is not necessarily perfect, but reasonable . . . [,] [a fit] that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served,' . . . [and a fit] that employs not necessarily the least restrictive means but . .

. a means *narrowly tailored* to achieve the desired objective.'"  *McCutcheon*, 572 U.S. at 218

(quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 [1989]) (emphasis added).

> In passing judgment, the Court must not only determine the legitimacy and
> strength of each of those interests; it must also consider the extent to which
> those interests make it necessary to burden the plaintiff's rights.  Only after
> weighing all these factors is the reviewing court in a position to decide
> whether the challenged provision is unconstitutional.

*Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).  Of course, protecting political parties from

"external competition cannot justify the virtual exclusion of other political aspirants from the

political arena."  *Anderson*, 460 U.S. at 802 (citing *Williams v. Rhodes*, 393 U.S. 23, 23, 31-32

[1968]).

Finally, it is important to note that, "[w]hen the government restricts speech, the

Government bears the burden of proving the constitutionality of its actions."  *McCutcheon*, 572

U.S. at 210 (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 US. 803, 816 2000]).  The

Supreme Court has "never accepted mere conjecture as adequate to carry a First Amendment

burden," when analyzing this fit between the objective and the means chosen to achieve that

objective.  *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 392 (2000); *McCutcheon*, 572 U.S. at

210.

### b.      Plaintiff's Claims Under the Fourteenth Amendment

The Equal Protection Clause "commands that no State shall 'deny to any person within its

jurisdiction the equal protection of the laws,' which is essentially a direction that all persons

similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S.

432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 [1982]); *Lanning v. City of Glens Falls*,

908 F.3d 19, 29 (2d Cir. 2018).  Although the "Equal Protection Clause does not make every minor

45

difference in the application of laws to different groups a violation of our Constitution," *Williams*, 393 U.S. at 29, "the equal protection guarantee . . . extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001); *Williams*, 393 U.S. at 30.  "The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne*, 473 U.S. at 440.  Where, as here, however, Plaintiffs claim the classification infringes on a fundamental right, courts apply the strict scrutiny standard of review, requiring the classification to be necessary to serve a compelling state interest.  *See Ill. St. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979) ("The freedom to associate as a political party [is] a right we have recognized as fundamental . . . . When such vital individual rights are at stake, a State must establish that its classification is necessary to serve a compelling interest."); *cf. Anderson*, 460 U.S. at 786 ("The impact of candidate eligibility requirements on voters implicates basic constitutional rights.").  This "necessity" requirement means that the classification must be the "least restrictive" means of serving the compelling interest (which the Supreme Court has also called a "precisely tailored" means).  *See, e.g., Ill. St. Bd. of Elections*, 440 U.S. at 186 ("The signature requirements for independent candidates and new political parties seeking offices in Chicago are plainly not the *least restrictive* means of protecting the State's objectives.") (emphasis added); *Plyler v. Doe,* 457 U.S. 202, 217 (1982) ("With respect to such classifications [that infringe on a fundamental right], it is appropriate to enforce the mandate of equal protection by requiring the State to demonstrate that its classification has been *precisely tailored* to serve a compelling governmental interest.") (emphasis added).

Where a plaintiff is not a member of a constitutionally protected class, "he [or she] may bring an equal protection claim pursuant to one of two theories: (1) selective enforcement, or (2) 'class of one.'" *AYDM Associates, LLC v. Town of Pamelia*, 205 F. Supp. 3d 252, 265 (N.D.N.Y. 2016) (D'Agostino, J.) (citation omitted). To succeed under a selective enforcement theory, a plaintiff must establish that (1) he or she, "compared with others similarly situated, was selectively treated," and (2) "the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, . . . to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995) (citation omitted); *Jordan v. New York City Bd. of Elections*, 816 F. App'x 599, 603-04 (2d Cir. 2020). A plaintiff must identify comparators that "'a reasonably prudent person would think were roughly equivalent'" to the plaintiff, though the plaintiff does not need to show an "exact correlation" between himself or herself and that similarly situated person. *AYDM Assoc.*, 205 F. Supp. 3d at 265 (quoting *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 696 [S.D.N.Y. 2011]).

To succeed under a class-of-one theory, a plaintiff must establish that he or she was "intentionally treated differently from others similarly situated and 'there is no rational basis for the difference in treatment.'" *Id.* (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 [2000]). Class-of-one plaintiffs "must show an extremely high degree of similarity between themselves and the persons [with] whom they compare themselves." *Clubside v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006). A plaintiff is not required to prove "a defendant's subjective ill-will towards a plaintiff," and can prevail on a class-of-one claim based on similarity alone. *Hu v. City of New York*, 927 F.3d 81, 93 (2d Cir. 2019). To prevail on similarity alone, a plaintiff must prove

47

as follows: "'(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.'" *Hu*, 927 F.3d at 94 (quoting *Neilson v. D'Angelis*, 409 F.3d, 100, 104-05 [2d Cir. 2005]).

### 2. Whether Plaintiffs or Defendants Are Entitled to Summary Judgment on Plaintiffs' Contribution-Limit Claims

After carefully considering the matter, the Court answers the first question (i.e., whether Plaintiffs are entitled to summary judgment on their contribution-limit claims) in the affirmative with regard to contribution limits in general elections and the second question (i.e., whether Defendants are entitled to summary judgment on Plaintiff's contribution-limit claims) in the negative to the extent the claims regard contribution limits in general elections for the reasons stated in Plaintiffs' memoranda of law; but the Court answers the second question (i.e., whether Defendants are entitled to summary judgment) in the affirmative and the first question (i.e., whether Plaintiffs are entitled to summary judgment) in the negative to the extent the claims regard contribution limits in primary elections for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.C. of this Decision and Order. To those reasons, the Court adds the following analysis, which is intended to supplement, not supplant, the parties' reasons.

### a. Whether Defendants Have Established a Sufficiently Important Interest for Purposes of Plaintiffs' Contribution-Limit Claims

The Supreme Court has identified only one legitimate governmental interest for restricting campaign finances: preventing corruption, specifically *quid pro quo* corruption, or its appearance. *McCutcheon*, 572 U.S. at 207. In fact, the Supreme Court has defined the government's interest in

preventing *quid pro quo* corruption or its appearance not only as "sufficiently important" but as "compelling." *Id*. at 199 (citing *Buckley*, 424 U.S. at 26-27, and *Nat'l. Conservative Political Action Comm.*, 470 U.S. at 496-97).  However, the Supreme Court has also observed, "the [mere] possibility that an individual who spends large sums [of money in connection with elections] may garner 'influence over or access to' elected officials or political parties [does not give rise to such an interest of preventing *quid pro quo* corruption or its appearance]" *Id.* at 208 (quoting *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 297 [2003] [Kennedy, J. concurring in judgment in part and dissenting in part]).  "In drawing [the] line [between protecting political speech and suppressing it], the First Amendment requires us to err on the side of protecting political speech rather than suppressing it." *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 457 (2007).  Recognizing this balance, the Second Circuit has observed that, while paying "special deference to legislative determinations regarding campaign contribution restrictions," the judiciary "must also protect the fundamental First Amendment interest in political speech." *Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir. 2011).

Despite the Supreme Court's observation of the general insufficiency of "the possibility" of influence, the Second Circuit has found that, "because the scope of *quid pro quo* corruption can never be reliably ascertained, the legislature may regulate certain indicators of such corruption or its appearance, such as when donors make large contributions because they have business with the City, hope to do business with the City, or are expending money on behalf of others who do business with the City." *Ognibene*, 671 F.3d at 187.  "[S]uch donations certainly feed the public perception of *quid pro quo* corruption, and this alone justifies limitations . . . ." *Id.*

49

Here, although the relevant legislative history from 1988 only four times mentions "corruption," it does so with regard to the risk of corruption caused by "excessive cash contributions" (made possible by the anonymity of the contributors, who may have "already reached their legal limit") that could "buy influence with a political party" and "be laundered through . . . housekeeping accounts," and the resulting "eat[ing] away at the credibility of our political system."  (Dkt. No. 57, Attach. 5, at 1-2, 18-19.)[14]  The linking of these two facts (i.e., the occurrence of excessive contributions and the eating away at the credibility of our political system) sufficiently demonstrates New York State's interest in preventing the appearance of *quid pro quo* corruption.  Moreover, the Court finds that it is logical to conclude that the appearance of *quid pro quo* corruption has at least a tendency to occur when an Independent Body has only a handful of individuals contributing financially to it, and the Independent Body participates in only a handful of elections.[15]  Indeed, commentators (whether correctly or incorrectly) appear to often hold a perception that a positive correlation exists between the likelihood of corruption stemming from

---

[14]     The Court acknowledges that, in response to Defendants' argument that the legislative history of N.Y. Elec. Law § 14-124(3), N.Y. Elec. Law § 14-114(1), (3), and (10) shows the risk of *quid pro quo* corruption and its appearance (Dkt. No. 57, Attach. 7, at 24; *cf.* Dkt. No. 57, Attach. 8, at 10-12), Plaintiffs argue that Defendants' reliance on it is a post-hoc justification in response to litigation.  (Dkt. No. 59, at 15, 28.)  However, the Court finds the legislative history to be of at least some relevance here.

[15]     The Court notes the stark contrast between the size of New York State's recognized Parties and the apparent size of Plaintiff UJP, approximately only five members of which have been identified.  (Dkt. No. 56, Attach. 2, at ¶¶ 15, 54.)  Data compiled by the parties indicates that as of November 1, 2020, the New York State's recognized Parties have the following number of active enrollees: the Democratic Party has 6,189,227 active enrollees; the Republican Party has 2,744,859 active enrollees; the Conservative Party has 151,012 active enrollees; the Working Families Party has active 40,367 enrollees; the Green Party has 24,972 active enrollees; the Libertarian Party has active 20,298 enrollees; the Independence Party has 434,501 active enrollees; and SAM has 647 active enrollees.

campaign contributions and the smaller the size of a political party (and thus, generally, the smaller

number of that party's donors and candidates).[16]  More importantly, the Supreme Court has

recognized that the effect of an individual's contribution to a candidate is "diluted" when that

contribution comes as part of a larger donation from a party encompassing the donations of many

individuals, suggesting that the effect of the contribution is concentrated in the opposite scenario.

*See Upstate Jobs Party v. Kosinski*, 18-CV-0459, 2018 WL 10436253, at *9 (N.D.N.Y. May 22,

2018) (Suddaby, C.J.) (citing *McCutcheon*, 572 U.S. at 212 ["When [a donor turns to other PACs

that are likely to give to Representative Smith], however, he discovers that his contribution will be

significantly diluted by all the contributions from others to the same PACs. . . . His salience as a

Smith supporter has been diminished, and with it the potential for corruption."]).

> **b.    Whether Defendants Have Established a Compelling State
>         Interest for Purposes of Plaintiffs' Contribution-Limit Claims**

As the Court stated in Part III.b.2.a of this Decision and Order, the Supreme Court has

defined the government's interest in preventing *quid pro quo* corruption or its appearance not only

---

[16]    *See*, *e.g.*, Michael S. Kang, *The Brave New World of Party Campaign Finance Law*, 101
Cornell L. Rev. 531, 569 (March 2016) ("Group-level corruption does not require the wholesale
corruption of a major party. Wholesale capture of a major party would be quite difficult, if not
impossible, because of the size and internal diversity of the major party coalitions."); Richard H.
Pildes, *Romanticizing Democracy, Political Fragmentation, and the Decline of American
Government*, 124 Yale L.J. 804, 839 (2014) ("Parties, after all, are constituted by numerous
interests and many donors, including large donors; parties dilute the role of money by pooling so
many interests and donors."); Nicholas Bamman, *Campaign Finance: Public Funding After
Bennett*, 27 J.L. & Pol. 323, 347 (Winter 2012) ("The fewer private funds the parties receive, the
less opportunity for corruption. But even if Parties receive some private funding, considering
relatively low contribution limits, and the sheer size of Parties, there would be little likelihood of
corruption stemming from any single private individual contribution."); Frank J. Favia, Jr.,
*Enforcing the Goals of the Bipartisan Campaign Reform Act: Silencing Nonprofit Groups and
Stealth PACs in Federal Elections*, 2006 U. Ill. L.Rev. 1081, 1096 (2006) ("[B]ecause the goal of
parties is to elect a wide array of candidates, a contribution to that party does not ensure that a
specific candidate will be grateful to the donor.") (internal quotation marks omitted).

as "sufficiently important" but as "compelling."  *McCutcheon*, 572 U.S. at 199 (citing *Buckley*, 424 U.S. at 26-27, and *Nat'l. Conservative Political Action Comm.*, 470 U.S. at 496-97).

For all of these reasons, the Court finds that Defendants have established a sufficiently important and compelling State interest in combatting the appearance of *quid pro quo* corruption in this context for purposes of Plaintiffs' claims under both the First Amendment and Fourteenth Amendment.  *See*, *supra*, Part III.B.2.a of this Decision and Order.  Because Defendants have done so, the Court will turn its analysis to whether the challenged statutes are "closely drawn" (though not necessarily the "least restrictive" means of serving the State's important interest) for purposes of Plaintiffs' First Amendment claims, and the "least restrictive" means of serving the State's compelling interest for purposes of Plaintiffs' Equal Protection claims (assuming that Independent Bodies are found to be similarly situated to Parties).

> **c.    Whether the Laws Regarding Contribution-Limits Are Closely Drawn for Purposes of Plaintiffs' Claims Under the First Amendment**

The Court begins its analysis of this issue by again observing that Defendants bear the burden of proving the constitutionality of their actions because, acting on behalf of the State of New York, they are restricting the speech and association of Independent Bodies on the ground that the contribution limits further the permitted objective of preventing *quid pro quo* corruption or its appearance.  *See, supra,* Part III.B.1.a. of this Decision and Order.  (Dkt. No. 57, Attach. 8, at 10-12.)

Contribution limits that are too low can harm the electoral process by preventing challengers from mounting effective campaigns against incumbent officeholders, thereby reducing democratic accountability.  *Randall v. Sorrell*, 548 U.S. 230, 248-49 (2006).  Courts "must review

the record independently and carefully with an eye toward assessing the statute's 'tailoring,' that is, toward assessing the proportionality of the restrictions." *Randall*, 548 U.S. at 249.

The *Randall* Court identified five factors that weigh in favor of a finding that a statute's contribution limits are too restrictive: (1) whether the record suggests that the statute's contribution limits will significantly restrict the amount of funding available for challengers to run competitive campaigns; (2) whether the statute's insistence that political parties abide by *exactly* the same low contribution limits that apply to other contributors threatens to harm the right to associate in a political party, which is "a particularly important political right;" (3) whether the statute fails to exclude expenses that individuals volunteering their time on behalf a candidate incur, such as travel expenses, in the course of campaign activities; (4) whether the statute fails to adjust its contribution limits for inflation; and (5) whether anywhere in the record a special justification exists that might warrant a contribution limit so low or so restrictive as to bring about the serious associational and expressive problems at issue.  *Randall*, 548 U.S. at 253-61.  Although these five factors were established four years before the famous *Citizens United* decision, the Court finds them at least somewhat instructive, particularly in light of the fact that Plaintiffs' challenges concern New York State's electoral system as a whole.[17]  *Cf. Green Party of Ct. v. Garfield*, 616 F.3d 189, 201 (2d Cir. 2010) (rejecting the strict application of the *Randall* factors after the issuance of *Citizens United* because contributions by lobbyists and contractors made up a fraction of campaign contributions and "did not focus on the *electoral* process") (emphasis in original).

---

[17]      The Court notes that the Supreme Court's recent decision in *Brnovich v. Democratic National Committee*, does not impact its analysis.  -- S. Ct. ---, 2021 WL 2690267 (2021)

###### i. Laws Regarding Contribution Limits in General Elections

The Court first addresses Defendants' argument that it should grant their summary judgment motion because Plaintiff Babinec has not donated the maximum amount to Plaintiff UJP as of the writing of this Decision and Order.  (Dkt. No. 57, Attach. 8, at 22-24.)  Defendants' argument is unavailing.  Were the Court to adopt such a requirement, that adoption would essentially burden Plaintiffs with an additional standing requirement.  Moreover, such a precedent could discourage future plaintiffs from challenging New York State election laws.

Equally unavailing is Defendants' argument that New York State election laws are closely drawn to address actual *quid pro quo* corruption.  As conceded by Defendants in their response to Plaintiffs' Statement of Material Facts (*see*, *supra*, Part I.B. of this Decision and Order), the State Board of Elections has no record of any enforcement action brought against Independent Bodies for violations of the contribution limit from individuals or contributions from Independent Bodies to candidates.  *See Ted Cruz for Senate v. FEC*, 19-CV-0908, 2021 WL 2269415, at *7 (D. D.C. June 3, 2021) ("[I]t is not sufficient for the FEC merely to *assert* an interest in preventing quid pro quo corruption.  The government must demonstrate the validity of its interest by more than 'mere conjecture.'") (emphasis in original) (quoting *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 392 [2000]).  Although Dr. Wilcox argues that the danger of corruption cannot be rooted out through disclosure, his argument not only focuses on large direct contributions to candidates but is conclusory.  (Dkt. No. 57, Attach. 3, at 4-5.)  In particular, Dr. Wilcox does not elaborate on how disclosure is ineffective in the remainder of his report.  (*Id.*)  Dr. Wilcox's anecdotal evidence of actual *quid pro quo* corruption occurring in Missouri and Montana involved State Representatives who were members of established Parties.  (*Id.* at 5.)  In the Court's view, the mere fact that Parties

are more regulated than Independent Bodies in New York State does not transform these anecdotes

into evidence establishing that these statutes are closely drawn to address *quid pro quo* corruption.

N.Y. Elec. Law §§ 2-102, 2-104, 2-114, 2-114, 2-116, 2-118, 14-100 et seq.

      The Court next addresses whether New York State election laws are closely drawn to

address the *appearance* of *quid pro quo* corruption.[18]  Defendants argue that, if Plaintiffs'

requested relief is granted, any individual with sufficient resources could use an Independent

Body as a mask for their own donations to a candidate, thereby sidestepping the current and

unchallenged limitations on an individual's donations to a candidate.  (Dkt. No. 57, Attach. 8.)

However, Defendants' argument is flawed in that it fails to address the fact that an individual,

under New York State's current contribution limits, is already prohibited from engaging in the

described conduct.

      For example, Plaintiff Babinec, who serves on the board of Plaintiff UJP, can contribute

$47,100.00 to Plaintiff UJP, as compared to $11,800.00 to a candidate in the general election for

New York State Senate, and $4,700.00 to a candidate in the general election for the New York

State Assembly.[19]  9 N.Y. Comp. Codes R. & Regs tit. 9 § 6214.0 (2019).  Therefore, despite

Defendants' argument that increasing Plaintiff Babinec's ability to contribute $117,600.00 to

Plaintiff UJP highlights the potential for the appearance of *quid pro quo* corruption, they fail to

---

[18]     Because Defendants have not adduced evidence of actual *quid pro quo* corruption in Independent Bodies, the Court need not, and does not, reach the issue of whether New York State's election laws are closely drawn to address actual *quid pro quo* corruption.

[19]     As stated above in note 1 of this Decision and Order, for purposes of its analysis, the Court uses the most up-to-date figures, and not the figures that were at issue when Plaintiffs filed their motion for preliminary injunction, which were $109,600.00, and $44,000.00.  9 N.Y. Comp. Codes R. & Regs tit. 9 § 6214.0 (2019).

establish how this potential for the appearance of *quid pro quo* corruption is not already present in the system.  Aside from the common-sense argument that the larger the contribution, the greater potential for the appearance of *quid pro quo* corruption, Defendants fail to justify how the disparate contribution limits combat the appearance of *quid pro quo* corruption; as stated above, the mere fact that Parties are more regulated than Independent Bodies does not establish that the statutes at issue are closely drawn to address the appearance of *quid pro quo* corruption.  (Dkt. No. 57, Attach. 8, at 23; Dkt. No. 57, Attach. 2, at 109-13; Dkt. No. 57, Attach. 3, at 4-5.)

Moreover, Defendants fail to substantively rebut Plaintiffs' argument that disclosure (specifically, the imposition on Independent Bodies of the same disclosure requirements that are imposed on Parties) is less intrusive than a disparate contribution limit between Parties and Independent Bodies as a method of monitoring or controlling contributions to an entity.  More specifically, Defendants have failed to produce admissible evidence that disclosure is not feasible.[20]  Even if the Court were to rely on evidence that Defendants adduced in opposition to Plaintiffs' prior motion for a preliminary injunction, the Court would find that Defendants have also conspicuously failed to substantively rebut either of the other two alternatives that Plaintiffs

---

[20]     The Court acknowledges that it came to the opposite conclusion when deciding Plaintiffs' motion for a preliminary injunction. *Upstate Jobs Party v. Kosinski*, 18-CV-0459, 2018 WL 10436253, at *9 (N.D.N.Y. May 22, 2018) (Suddaby, C.J.).  However, "the Court's findings of fact and conclusions of law made on motion for preliminary injunction are not binding on the Court when deciding a motion for summary judgment." *Malletier v. Dooney & Bourke, Inc.*, 561 F. Supp. 2d 368, 382 (S.D.N.Y. 2008).  "This is because the 'parties are held to different standards of proof in preliminary injunction hearings than in motions for summary judgment and because findings of fact at the preliminary injunction stage are not as fully fleshed out as at the summary judgment stage'" (i.e., they are often based on different groups of evidence). *Malletier*, 561 F. Supp. 2d at 382 (quoting *DeSmeth v. Samsung Am.*, 92-CV-3710, 1998 WL 315469, at *2 [S.D.N.Y. June 16, 1998]).  Here, Defendants' opposition to this aspect of Plaintiffs' motion for summary judgment is actually based on less evidence that was its opposition to the analogous aspect of Plaintiffs' motion for a preliminary injunction.

have offered (i.e., the enactment of "anti-proliferation statutes" prohibiting individuals from establishing Independent Bodies when those individuals are connected to either Parties or other Independent Bodies, or the enactment of statutes requiring that contributions to Independent Bodies from individuals who have contributed the maximum amount to candidates be placed in a separate bank account and spent on activities in which the money is not directly flowing to the candidate such as "Get Out the Vote" efforts and signature gathering).  As a result, Defendants have implicitly conceded the merit of these alternatives.

Although the Court is aware of its responsibilities to resolve all ambiguities and draw all reasonable inferences against the movant, *Anderson,* 477 U.S. at 255, as the Court stated earlier, Defendants maintain the burden of demonstrating that the laws at issue are closely drawn to combatting *quid pro quo* corruption or its appearance.  *See McCutcheon*, 572 U.S. at 210 (quoting *Playboy*, 529 US. at 816) ("When the government restricts speech, the Government bears the burden of proving the constitutionality of its actions.").  Moreover, the Supreme Court has "never accepted mere conjecture as adequate to carry a First Amendment burden," when analyzing this fit between the objective and the means chosen to achieve that objective.  *Nixon*, 528 U.S. at 392; *McCutcheon*, 572 U.S. at 210.

Rather than attempt to substantively rebut Plaintiffs' proposed alternatives, Defendants again argue that an increase in the contribution limits to Independent Bodies would increase *quid pro quo* corruption or its appearance.  However, setting aside the non-responsiveness of this argument, as the Court has stated, Defendants have failed to explain (or adduce evidence establishing) how this increase warrants a contribution limit to Parties that is *more than double* (i.e., disproportionate to) the contribution limit to Independent Bodies.  (Dkt. No. 57, Attach. 8;

Dkt. No. 67.)  Indeed, as the Supreme Court has observed, "[T]here is not the same risk of *quid pro quo* corruption or its appearance when money flows through independent actors to a candidate, as when a donor contributes to a candidate directly."  *McCutcheon*, 572 U.S. at 210.  Simply stated, although Defendants need not show that they have employed the least-restrictive means of achieving the desired objective, the Court finds that they have not even shown that they have employed a means that is closely drawn to achieve the desired objective.

For all of these reasons, the Court grants Plaintiffs' motion for summary judgment on their First Amendment claims regarding the disparate contribution limits in general elections between Parties and Independent Bodies (and denies Defendants' cross-motion for summary judgment on those First Amendment claims).

### ii.      Laws Regarding Contribution Limits in Primary Elections

In their cross-motion for summary judgment, Defendants argue that Plaintiffs' claims regarding the disparity in contribution limits by Independent Bodies and Parties in primary elections are unsupported by the record and must therefore be dismissed.  (Dkt. No. 57, Attach. 8, at 26.)  In their combined reply to Defendants' opposition and opposition to Defendants' motion, Plaintiffs fail to respond to Defendants' argument.  (Dkt. No. 59.)   In fact, Plaintiffs mention primary elections only in their discussion of *Riddle,* 742 F.3d at 924, 926, in another context (i.e., with regard to whether Independent Bodies are similarity situated to Parties)*.  (Id.* at 27.)  As stated above in Part II.A. of this Decision and Order, where a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possesses facial merit, which has been appropriately characterized as a "modest" burden.

Under the circumstances, the Court must find that Defendants have met their lightened burden on this unopposed aspect of their cross-motion for summary judgment.  Based on the record before the Court, it appears that Plaintiff UJP does not hold, and has not held, primary elections when determining the candidates that it wishes to support.  (*See generally* Dkt. No. 56, Attach. 2 [Plfs.' Statement of Material Facts, omitting any reference to primary elections]; Dkt. No. 59 [Plfs.' Response to Defs.' Cross-Motion, omitting any citation to record evidence regarding primary elections].)  Moreover, as Defendants argue, Parties are subject to one aggregate contribution limit for spending on all elections together (i.e., they do not receive additional contribution limit for primary elections).  9 N.Y. Comp. Codes R. & Regs tit. 9 § 6214.0.  Finally, as Defendants also argue, contribution limits in primary elections apply only to candidates participating in a contested primary and/or to their authorized committees (and Independent Bodies are not required to conduct primary elections).  N.Y. Elec. Law § 14-114.

For all of these reasons, the Court grants Defendants' motion for summary judgment on Plaintiffs' First Amendment claims regarding contribution limits in primary elections.[21]

> **d.**     **Whether the Laws Regarding Contribution-Limits Are the Least-Restrictive Means for Purposes of Plaintiffs' Claims Under the Fourteenth Amendment**

---

[21]     The Court notes that it need not "deny" this aspect of Plaintiffs' motion for summary judgment because that motion did not differentiate between contribution limits in general elections and those in primary elections.  In any event, even if Plaintiffs' motion could somehow be liberally construed as having done so, the Court would deny that motion with respect to Plaintiffs' First Amendment claims regarding contribution limits in primary elections for the reasons set forth above.

As the Court has previously explained, because Plaintiffs claim that New York State Election laws burdens a fundamental right, the Court must determine whether those laws are the least-restrictive means of serving the State's compelling interest.

Because the Court has already concluded that the State interest is compelling, it next addresses whether New York State's laws concerning housekeeping accounts satisfy the least-restrictive means standard for purposes of Plaintiff's Fourteenth Amendment Equal Protection claims.  To do so, the Court must first determine whether Plaintiff UJP, as an Independent Body, is similarly situated to Parties with regard to contribution-limits.  *See Marcello v. Currey*, 364 F. Supp. 3d 155, 159 (D. Conn. 2019) ("[T]he Equal Protection Clause's similarly situated requirement applies even when a law discriminates on the basis of a suspect class or exercise of a fundamental right.").  "As a general rule, whether items are similarly situated is a factual issue that should be submitted to the jury."  *Harlan Assocs. v. Inc. Vill of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001) (citing *Graham v. Long Island R.R.*, 230 F.3d 34, 39 [2d Cir. 2000]).  However, "a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met."  *Harlan Assocs.*, 273 F.3d at 499 n.2 (citing *Cruz v. Coach Stores*, 202 F.3d 560, 568 [2d Cir. 2000]).

In this case, the Court finds that Parties and Independent Bodies are similarly situated with regard to the contribution-limits outlined by New York State.  New York State defines an Independent Body as "any organization or group of voters who nominates a candidate or candidates for office to be voted for at an election, and which is not a party. . . ."  N.Y. Elec. Law § 1-104(12).  Meanwhile, a party is simply an organization whose gubernatorial and presidential candidates received a certain number of votes in the last preceding election.  *Id.* at § 1-104(3).

60

Therefore, New York State differentiates a Party and an Independent Body solely on the number of votes cast in a specific election; both compete for the same votes in the general election. Because monetary contributions are an expression of speech, the different contribution-limits among the two groups infringes on Independent Bodies' political associations. *Corren v. Condos*, 898 F.3d 209, 218 (2d Cir. 2018) (quoting *FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 440 [2001]). Although Defendants are correct that Parties occupy a unique position in our democracy, *McCutcheon*, 572 U.S. at 210-11, New York State cannot stifle and/or limit the voices or messages from Independent Bodies based solely on their size. Accordingly, the Court finds that Independent Bodies are similarly situated to Parties with regard to contribution limits.

As discussed in Part III.B.2.b.i. of this Decision and Order, the Court has found that the laws regarding contribution limits in general elections fail to meet the closely drawn standard as a matter of law. Because the closely drawn standard is easier to meet than is the least-restrictive-means standard, the Court has no choice but to find that the laws regarding contribution limits in general elections also fail to meet the least-restrictive-means standard, and to grant Plaintiffs' motion for summary judgment with respect to their Fourteenth Amendment claim. *Ted Cruz for Senate v. FEC*, 2021 WL 2269415, at *6.

The Court reaches a different conclusion, however, with respect to Plaintiffs' Fourteenth Amendment Equal Protection claims regarding contribution limits in primary elections for the reasons set forth above in Part III.B.2.a.ii. of this Decision and Order: based on the record before the Court, it appears that Plaintiff UJP does not hold, and has not held, primary elections when determining the candidates that it wishes to support. (*See generally* Dkt. No. 56, Attach. 2 [Plfs.' Statement of Material Facts, omitting any reference to primary elections]; Dkt. No. 59 [Plfs.'

61

Response to Defs.' Cross-Motion, omitting any citation to record evidence regarding primary elections].)[22]

For all of these reasons, the Court grants Plaintiffs' motion for summary judgment on their First Amendment claims regarding contribution limits in general elections, denies Defendants' motion for summary judgment on those claims, grants Defendants' motion for summary judgment on Plaintiff's First Amendment claims regarding contribution limits in primary elections, grants Plaintiff's motion for summary judgment on Plaintiff's Fourteenth Amendment Equal Protection claims regarding contribution limits in general elections, and grants Defendants' motion for summary judgment on Plaintiff's Fourteenth Amendment Equal Protection claims regarding contribution limits in primary elections.

### 3. Whether Plaintiffs or Defendants Are Entitled to Summary Judgment on Plaintiffs' Housekeeping-Account Claims

After carefully considering the questions, the Court answers the first question (i.e., whether Plaintiffs are entitled to summary judgment on their housekeeping-account claims) in the negative and the second question (i.e., whether Defendants are entitled to summary judgment on Plaintiffs' housekeeping-account claims) in the affirmative to the extent the claims arise under the First Amendment for the reasons stated in Defendants' memorandum of law; and the Court answers the first question (i.e., whether Plaintiffs are entitled to summary judgment on their housekeeping-account claims) in the negative and the second question (i.e. whether Defendants are entitled to

---

[22]    The Court notes again that Plaintiffs' motion for summary judgment has not differentiated between contribution limits in general elections and those in primary elections.  In any event, even if the motion could be liberally construed as having done so, the Court would deny that motion with respect to Plaintiffs' Fourteenth Amendment claims regarding contribution limits in primary elections for the reasons set forth above.

summary judgment on Plaintiffs' housekeeping-account claims) in the affirmative to the extent the claims arise under the Fourteenth Amendment for the reasons stated below. *See, supra,* Part I.C. of this Decision and Order.

> **a.** **Whether the Laws Regarding Housekeeping Accounts Are Closely Drawn for Purposes of Plaintiffs' Claims Under the First Amendment**

The Court has already found that Defendants have established, as a matter of law, a sufficiently important (and indeed a compelling) State interest for purposes of Plaintiffs' contribution-limit claims under the First Amendment. *See, supra,* Part III.B.2.a. of this Decision and Order. The Court finds no reason that its analysis of that issue should not also apply to whether Defendants have established a sufficiently important (and indeed a compelling) State interest for purposes of Plaintiffs' housekeeping-account claims under the First Amendment. As a result, the Court will turn its attention to whether the laws regarding housekeeping accounts are closely drawn under the First Amendment.[23]

"Parties, under the New York Election Law, are entitled to certain benefits, and are subject to certain requirements, which independent [bodies] are not." *SAM Party v. Kosinski*, 483 F. Supp. 3d 245, 250 (S.D.N.Y. 2020). "For example, parties are permitted to maintain a segregated account, often called a 'housekeeping account,' to pay for the maintenance of its headquarters and party staff, to which ordinary contribution limits do not apply." *SAM Party,* 483 F. Supp.3d at 251 (citing N.Y. Elec. Law § 14-124[3]).

---

[23]     The Court utilizes the traditional equal protection analysis under the Fourteenth Amendment instead of the *Anderson-Burdwick* standard. *See Libertarian Party of Conn. v. Lamont*, 977 F.3d 173, 177 (2d Cir. 2020) ("Challenges to state action restricting ballot access are evaluated under the Anderson-Burdick framework.") Here, Plaintiffs do not challenge their ballot access (or lack thereof), thereby rendering this standard inapplicable to the facts of this case.

Because ordinary contribution limits do not apply to housekeeping accounts, there is a significant danger of the appearance of *quid pro quo* corruption in connection with them.  As Dr. Wilcox has opined, generally, the larger the contribution, the greater the threat of corruption.  (Dkt. No. 57, Attach. 3, at 9.)  Mr. Quail also testified that there would be an "endemic [of] quid pro quo corruption," were Independent Bodies able to "proliferate essentially in an unlimited manner." (Dkt. No. 56, Attach. 3, at 382-83.)  Although Plaintiffs do not seek to change New York Election Law to somehow transform Independent Bodies into Parties, were Independent Bodies permitted to maintain housekeeping accounts, they would have almost unfettered discretion to spend the donations on anything except things "for the express purpose of promoting the candidacy of specific candidates," which could include lavish perks, bonuses, or even expenditures that indirectly promote the candidacy of specific candidates.  N.Y. Elec. Law. § 14-124(3).  This potential for *quid pro quo* corruption would be exacerbated by the fact that Independent Bodies are not subject to the same regulations as Parties, which would be further exacerbated where, as here, the Independent Body's founder is one of its directors, the director of the associated Independent Expenditure Committee, and both entities' largest (and frequently only) donor.  (Dkt. No. 56, Attach. 3 at 126-29, 236-54.)  With limited donors and candidates, candidates from these Independent Bodies would be able to easily identify the source of the donation, which could lead to a candidate feeling obligated to take certain positions and contribute to the appearance of *quid pro quo* corruption.  Although in this case there is a firewall policy between the Independent Expenditure Committee and Independent Body, the Court is skeptical whether other Independent Bodies would have, and abide by, such a policy.

Simply stated, after carefully considering the unlimited nature of donations and the disparity in regulation between Parties and Independent Bodies, the Court finds that, based on the record evidence before it, the laws at issue satisfy the closely drawn standard of the First Amendment to address the appearance of *quid pro quo* corruption with respect to housekeeping accounts, as a matter of law.  Accordingly, the Court concludes that Defendants are entitled to summary judgment on Plaintiffs' First Amendment claims regarding housekeeping accounts and that Plaintiffs' motion for summary judgment be denied with respect to those claims.

> **b.** **Whether the Laws Regarding Housekeeping Accounts Are the Least-Restrictive Means for Purposes of Plaintiffs' Claims Under the Fourteenth Amendment**

Because the Court has already concluded that the State's interest in combatting the appearance of *quid pro quo* corruption in this context is compelling, it next addresses whether Independent Bodies are similarly situated to Parties with regard to housekeeping accounts, and (if so) whether New York State's laws concerning housekeeping accounts satisfy the least-restrictive means standard for Plaintiff's Fourteenth Amendment Equal Protection claims.

Plaintiffs have argued and adduced evidence that Independent Bodies are similarly situated to Parties in New York State.  (Dkt. No. 59, at 24-28.)  Although the question of whether two groups are similarly situated is generally a threshold factual question, *see Reynolds v. Quiros*, 990 F.3d 286, 300 (2d Cir. 2021) ("To prevail on an equal protection claim, 'a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination."), the Court finds it unnecessary to answer this question here because, even if it were to find as a matter of law that Independent Bodies are similarly situated to Parties in New York State with regard to housekeeping accounts, the Court would find, for the

same reasons that the Court has found that Defendants have satisfied the closely drawn standard, that as a matter of law Defendants have demonstrated that the laws concerning housekeeping-accounts are the least restrictive means of regulation.

For all of these reasons, the Court denies Plaintiffs' motion for summary judgment on their First Amendment claims regarding housekeeping accounts and grants Defendants' motion for summary judgment on those claims, and denies Plaintiffs' motion for summary judgment on their Fourteenth Equal Protection claims regarding housekeeping accounts and grants Defendants' motion for summary judgment on those claims.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiffs' motion to exclude Mr. Brian Quail's declaration and testimony is **DENIED** in part and **GRANTED** in part as discussed above in Part III.A.3. of this Decision and Order; and it is further

**ORDERED** that Plaintiffs' motion to exclude Dr. Clyde Wilcox's expert report and testimony is **DENIED**; and it is further

**ORDERED** that Plaintiffs' motion for summary judgment (Dkt. No. 56) is **GRANTED** in part and **DENIED** in part in the following respects:

(1) a Judgment shall be entered as a matter of law in Plaintiffs' favor on their First Amendment claims regarding contribution limits in general elections, and their Fourteenth Amendment claims regarding contribution limits in general elections; and

(2) the remainder of Plaintiffs' motion is denied (i.e., the extent to which it seeks summary judgment on their First Amendment claims regarding housekeeping

accounts, and their Fourteenth Amendment claims regarding housekeeping

accounts); and it is further

**ORDERED** that Defendants' motion for summary judgment is **GRANTED** **in part** and

**DENIED** **in part** in the following respects:

> (1) a Judgment shall be entered as a matter of law in Defendants' favor on
>
> Plaintiffs' First Amendment claims regarding contribution limits in primary
>
> elections, their Fourteenth Amendment claims regarding contribution limits in
>
> primary elections, their First Amendment claims regarding housekeeping
>
> accounts, and their Fourteenth Amendment claims regarding housekeeping
>
> accounts; and
>
> (2) the remainder of Defendants' motion is denied (i.e., the extent to which it seeks
>
> summary judgment on Plaintiffs' First Amendment claims regarding
>
> contribution limits in general elections, and their Fourteenth Amendment claims
>
> regarding contribution limits in general elections); and it is further

**ORDERED that the Clerk of Court shall issue a Judgment in accord with the above-stated rulings and close this action**.

Dated:   September 8, 2021
             Syracuse, New York

Hon. Glenn T. Suddaby
Chief U.S. District Judge